ST. LOUIS INSURANCE COMPANY *vs.* GLASGOW, SHAW & LARKIN.

8 713
126 116

1. Insurers are responsible for a loss occasioned by a risk insured against, notwithstanding such loss may be attributable to the negligence or misconduct—not amounting to barratry—of the assured or his agents.

2. Where a steamboat was insured, among other risks, against *fire*, and afterwards was put on the floating dock, for the purpose of being repaired, and while on the dock was burned, and such burning was occasioned by the carelessness and negligence of the workmen having the boat in charge, the insurers were held liable for the loss.

3. Where the assured stipulates in the policy that the boat shall be completely provided with "master, officers and crew," it is no breach of such stipulation that the boat was placed, temporarily, in the charge of workmen, for the purpose of repairs.

4. Where the assured agrees that the boat shall be completely provided with "master, officers and crew," it is necessary to aver, in an action on the policy, that the boat was so provided.

APPEAL from Circuit Court of St. Louis.

SPALDING *and* TIFFANY, *for Appellants.*

H. R. GAMBLE, *for Appellees.*

NAPTON, J., *delivered the opinion of the Court.*

This was an action of covenant on a policy of insurance, brought by Glasgow, Shaw & Larkin against the insurance company.

The policy was for $6,000 on one-fourth of the steamboat Pizarro, for one

year, against the ordinary perils of "rivers, fires, enemies, &c.," and the assured agreed, "that the steamboat aforesaid should be competently provided with master, officers and crew."

The declaration contains no averment of a compliance with the agreement, that the boat should be competently provided with "master, officers and crew," but avers the loss to have happened within the year, and by *fire*, whilst the boat was lying at St. Louis.

The defendants filed several pleas, five of which were demurred to, and the demurrer sustained. These pleas are numbered on the record, the 5th, 6th, 7th, 8th, and an additional plea.

The fifth plea alleges, that the loss in the declaration mentioned was occasioned by and through the mere carelessness, negligence and misconduct of the plaintiffs, their servants and agents, then and there in the possession, charge and control of said boat.

The sixth plea avers, that, "just before the loss in the declaration mentioned, the plaintiffs, their servants and agents, caused the said steamboat to be put on a dock, called a floating dock, by means of which dock the boat was raised out of and above the surface of the river, and so continued until the loss; and while the boat was in that situation, the plaintiffs, their servants and agents, caused a fire to be made and kept in a stove on the deck of the boat, and caused large quantities of picked oakum to be placed and spread upon the deck of the boat, about and near the fire so made and kept by the plaintiffs, their servants and agents, whereby and by means whereof the peril and danger of consuming, burning and destroying said boat by fire, was enhanced and increased, without the knowledge, privity or consent of the defendants, contrary to the tenor and effect, true intent and meaning of the policy."

In the seventh plea, it is alleged, that, "before and at the time of the loss, the steamboat was on the floating dock, above the surface of the Mississippi; and just before the loss, certain workmen and laborers in the retainer of the plaintiffs caused a fire to be made in a stove on board the boat, and then and there, near and about the fire, picked a large quantity of combustible material, called oakum, and spread the said oakum about and near the fire, whereby the peril and danger of burning said boat was greatly increased, and, by the mere carelessness, negligence and misconduct of said workmen and laborers, the said oakum was set on fire, and by the fire so occasioned the said boat was burned," &c.

The eighth plea states, "that just before and at the time of the loss, the said steamboat was not in the possession, nor under the care or control of the plaintiffs or other owners, the master, officers and crew, or the servants and agents of the owners, or any of them, but the said boat, at the time when, &c., was in the possession of certain workmen and laborers, with the knowledge, privity and consent of the plaintiffs, and without the knowledge, privity and consent of the defendants, contrary to the intent of the policy, and while said boat was so in possession, and under the care and control of said workmen and laborers, the said boat was burnt, consumed and destroyed, by the mere carelessness, negligence and misconduct of the said workmen and agents, which is the same loss," &c.

The additional plea alleges, "that just before the loss, the plaintiffs and their servants and agents, without the knowledge or consent of the defendants, caused the boat to be put and placed on the floating dock, and raised above the water, and so kept until at and after the loss; and while the boat was so lying on the dock above the Mississippi river, and just before the loss, the workmen engaged in the retainer of the plaintiffs, in repairing the boat, did, unnecessarily and improperly, without the knowledge or consent of the defendants, cause a fire to be made and kept on board said boat, in a stove there, and did then and there, unnecessarily and improperly put, place and spread, near and about said fire so made and kept, and at other places in and about said boat, a large quantity of a certain combustible material, called picked oakum, whereby the danger and peril of fire, and the burning of said boat, became and was improperly and unnecessarily greatly increased and enhanced, contrary to the duty of the plaintiffs, their servants and agents in that behalf, and the meaning of the policy; and afterwards, while the said boat was so on the said dock, above the surface of said river, and while the said picked oakum was so kept and spread on and about the said boat, was then and there set on fire, and burned, and by the burning of said oakum, and the fire so occasioned, the said steamboat was burned," &c.

The only question presented by the record is, the propriety of the action of the Circuit Court in sustaining the demurrer to the above pleas.

Upon this question several points have been made, but the most important one arises out of the fifth, sixth and eighth pleas, in which the loss is averred to have been occasioned by the negligence, carelessness and misconduct of the agents of the assured. As the point is also involved in the consideration of the other pleas, it will first be disposed of.

It has been admitted in the argument of this case, and the adjudged cases fully sustain the admission, that where the misconduct amounts to barratry, and there is no express insurance against barratry, the underwriters will not be responsible for a loss occasioned by barratrous conduct of the agents of the insured.

It is also agreed, that where the insured have not complied with their express warranty, that the vessel shall be competently provided with master, officers and crew, a loss occasioned by such non-compliance is not covered by the policy. Some of the pleas demurred to are referred to this principle, and their sufficiency will be considered hereafter.

The question is, whether, when the insured have provided competent officers and crew, and the boat has been furnished with the necessary tackle and appurtenances, in compliance with the express warranty in the policy, the underwriters are discharged from a loss occasioned by a peril insured against, by showing that such peril was brought about by the negligence or mismanagement of the agents of the insured. Upon this question the counsel for the appellants has presented, in his brief, a critical review of all the authorities, reaching back to some of the earliest English cases. We shall not attempt to reconcile the cases thus arrayed, nor to defend the opinions and course of reasoning which have given occasion to the comments, and in some instances to the censure of the learned counsel.

An examination of the cases will, we think, show, that since the case of Burk

*vs.* Royal Exchange Company, decided in 1818, nearly every court in which this question has arisen has manifested a decided inclination to hold the underwriters responsible for losses occasioned by a risk insured against, notwithstanding such loss may have been attributable to the negligence or misconduct of the assured or his agents.—Walker *vs.* Maitland, 5 Barn. & Ald., 171; Bishop *vs.* Pentland, 7 Barn. & Cress., 219; Patapsco Insurance Company *vs.* Coalter, 3 Peters' Rep., 222; Columbia Insurance Company *vs.* Laurence, 10 Peters, 507; Waters *vs.* Merchants' Insurance Company, 11 *Ibid.*, 213; Perrin's Administrators *vs.* The Protection Insurance Company, 11 Ohio Rep., 147.

The doctrine established by these cases, we consider founded on principles of sound policy. It does not depend upon the insertion of barratry, as one of the risks assumed, but it arises from the fact, that the loss happens by a risk aimed against, and that to permit the insurer, in such cases, to show that it can be traced, either immediately or remotely to some negligence, carelessness, inattention or misconduct of the owner or his agents, would be to raise an implied warranty, not of the *general competency* of master, officers and crew, but of their diligence *at all times, and under all circumstances.* To adopt this construction of the policy would certainly tend to great embarrassment in the recovery of claims clearly understood to be secured by the contract of the parties. It would be imposing upon the assured a liability which is certainly not to be found in the words of his contract, and not, as we think, justified by its spirit. He is bound to provide competent officers, and to have his vessel seaworthy, but he does not stipulate that these officers shall be exempt from the frailties incident to men in all situations; that they shall exercise such diligence as shall prevent all losses from mistakes, carelessness and negligence. If the negligence be what is called *crassa negligentia*, which is by some writers considered synonymous with fraud, the case is different, and the underwriters are exempt upon another principle, unless fraud also is expressly insured against. Indeed, there are few of the risks contained in the common marine and river policies, which might not be traced to some act of negligence or oversight in those having charge of the vessel. In the case of fire especially, we cannot readily conceive of any loss by this element, unless in cases of lightning, where it must not necessarily have been the result of some mismanagement on the part of those in command or their servants. To say, in such cases, that though the vessel has been insured against fire, yet the underwriter has not insured against a fire happening by negligence, would be to "keep the word of promise to the ear and break it to the hope."

It is true that this doctrine, that negligence or misconduct on the part of the servants or agents of the insured will not exempt the underwriters, where the loss is occasioned by a peril insured against, was originally held *in* cases where barratry was one of the perils enumerated in the policy, and this circumstance afforded the courts a plausible ground for the adoption of the rule. This was the ground taken by Judge Johnson in the case of the Patapsco Insurance Company *vs.* Coalter, (3 Peters) decided in 1830, though Judge Story subsequently intimates, in the case of Waters *vs.* Merchants' Insurance Company, that a majority of the court were for the plaintiff, upon the general ground, that the proximate

and not the remote cause was to be looked to.  Upon the insufficiency of this course of reasoning, the Supreme Court of Ohio chiefly relied on the fire cases referred to in the brief of the appellant's counsel for adhering to the doctrine supposed to have been settled by more ancient cases, and disavowing and repudiating what was thought to be a mere innovation by the court in Bank vs. Royal Exchange Company.  In all the English cases, we suppose barratry was among the enumerated perils in the policy, but in the case of Walker vs. Maitland, (5 Barn. & Ald., 171,) though this circumstance is alluded to by the judges, their opinion seems to be founded mainly upon the ground, that the immediate cause of the loss was a peril insured against, and the underwriters should not be permitted to show negligence as a cause of such peril, because there was no implied warranty in the policy that there would be no negligence.  Bayley, J., says, "It is the duty of the owner to have the ship properly equipped, and for that purpose, it is necessary that he should provide a competent master and crew in the first instance; but having done that, he has discharged his duty, and is not responsible for their negligence as between him and the underwriters."  Holroyd, J., says, " This case cannot be put on the ground of the breach of the implied warranty to provide a master and crew of competent skill.  It is sufficient if the owners provide a master and crew generally competent; *there is no implied warranty that such a crew shall not be guilty of negligence.*"

So, in the case of Bishop vs. Pentland, (7 Barn. & Cress., 219,) the court seems to lose sight of the barratry clause, as affording any reason for their conclusions; and Bayley, J., says, "The case of Burk vs. The Royal Exchange Company, and Walker vs. Maitland, establish as a principle, that the underwriters are liable for a loss, the proximate cause of which is one of the enumerated risks, though the remote cause may be traced to the negligence of the master and mariners."  And Holroyd, J., says, "It is clearly established, that if there be an actual stranding, although it arise from the negligence of the master and mariners, the underwriters are liable."

The Columbia Insurance Company vs. Laurence, (10 Peters, 508,) was a case of insurance against fire on land, but the opinion delivered by Judge Story shows the gradual progress of this doctrine in that court.  "In regard to marine policies," says Judge Story, "this was formerly a question much vexed in the English and American courts; but in England, the point was completely settled, in Burk vs. Royal Exchange Company, upon the ground, that *causa proxima non remota spectatur;* and therefore, a loss whose proximate cause is one of the enumerated risks in the policy, is chargeable to the underwriters, although the remote cause may be traced to the negligence of the master and mariners. Although, in that case, the risk of barratry was also assumed by the underwriters, yet it is manifest that the opinion proceeded upon the broad and general ground.  The same doctrine was afterwards affirmed in Walker vs. Maitland, and Bishop vs. Pentland, and is now deemed incontrovertibly established.  The same doctrine was fully adopted in this court, in the case of the Patapsco Insurance Company vs. Coalter."

These remarks of Judge Story are certainly *obiter dicta,* and may be obnoxious

to the severe criticism bestowed on them by the appellant's counsel, but they show that the unsatisfactory reasons given by the British judges for a doctrine advanced, as is now said, for the first time in 1818, were no obstacle to its rapid adoption by other courts, and that this Court was even then prepared to sanction it to the same extent it was ultimately settled in Waters *vs.* Louisville Marine Insurance Company.

In Ohio, the case of Lodwicks & Kennedy *vs.* Ohio Insurance Company, (5 Ohio Rep., 433); Gazzam *vs.* Ohio Insurance Company, (1 Wright's Rep., 202); Jolly's Executors *vs.* Ohio Insurance Company, (1 *Ibid.*, 539); Fulton & Foster *vs.* Lancaster Insurance Company, (7 Ohio Rep., 1,) were decided since the case of Burk *vs.* Royal Exchange Company in England, and they are the only cases to which we have been referred, in which the doctrine held in this last and the succeeding English cases has been expressly denied, that were decided since the year 1818. These cases have all been overruled by the same court, in Perrin's Administrators *vs.* The Protection Insurance Company, 11 Ohio Rep., 147. Whatever may be thought of the propriety of that court's yielding to the authority of the Supreme Court of the United States, in a question upon which the opinion of that court was not binding upon them, it is at least to be inferred, that the policy and good sense of the doctrine must have been most striking, to have induced a court thus to overrule what had been solemnly and repeatedly adjudged in several previous cases.

In opposition to this doctrine, thus authoritatively settled in England, in Ohio, and in the Supreme Court of the United States, the counsel for the appellants have cited numerous adjudications on both sides of the Atlantic.—Gordon *vs.* Remington, 1 Camp., 123; Hodgeon *vs.* Malcom, 5 Boss & Pull., 336; Phyan *vs.* Royal Exchange Company, 7 T. Rep., 510; Vos & Graves *vs.* U. Insurance Company, 2 Johns. Ca., 180; Brazier *vs.* Clapp, 5 Mass. Rep., 5; Cleveland *vs.* Union Insurance Company, 8 Mass. Rep., 308; Grin *vs.* Phœnix Insurance Company, 13 Johns. Rep., 451. In relation to these cases, it may be observed, that they were all decided previous to 1818. Moreover, many of these cases, though apparently conflicting with the views which now prevail in relation to the duties of the insured, in a marine or river policy, will be found to turn upon that clause of the policy which stipulates for the competency of the master and crew of the vessel. The mere fact of negligence or misconduct is not the leading and prominent feature in the cases; but it is connected with the breach of the express or implied warranty, that the insured will employ competent agents. For instance, the case of Brazier *vs.* Clapp was a case in which the captain of the vessel had pursued a route from Boston to New Orleans which was unusual, and Judge Sedgwick, who delivered the opinion of the court, said, "A general position, that the mistake of the captain, under no circumstances, forms an excuse for a deviation, is certainly not true. The most skilful, discreet and prudent master may, and probably, in almost all long voyages, does commit mistakes, by which his ship may be taken out of the most direct and shortest course. Such is not a deviation that will discharge the underwriters." But he adds, "If the captain had ordinary skill, and was informed, as he ought to have been, as to the

voyage he was pursuing, no fact which was exhibited at the trial, or is now pretended to have existed, amounts to anything like a justification or excuse for the deviation on which the defendant relies as having vacated the contract. If such skill and information were possessed by the captain, the deviation would seem to be merely wanton, or done for the convenience of the captain, in landing his wife on the vineyard. On the other hand, if the deviation happened either from the want of skill or the gross ignorance of the captain, that would doubtless defeat the claim of the plaintiffs to recover; for, among other things which the law, from the nature of the contract of assurance, imposes as obligation upon the assured, is the duty to provide a master of competent skill, prudence and discretion to navigate the vessel, and if any loss takes place, which may be justly supposed to have happened from a master of that character not having been provided, the underwriters are not responsible for it."

Now, there is nothing in this opinion conflicting with the position which we maintain. The insured is bound, by the express stipulations of the contract, to provide a master, and one of competent skill, prudence and discretion; but it does not therefore follow, that he also warrants that the master thus ordinarily competent, shall not be guilty of negligence or mistakes. In the case cited, it was a mere question of evidence, and the Massachusetts court only hold that the departure from the usual route, proved in that case, was evidence of such unskilfulness, or gross ignorance in the captain, as showed him not to have been a competent master, within the meaning of the policy, and was therefore such a breach of the warranty as to discharge the underwriters.

So, in Cleveland *vs.* Union Insurance Company, (8 Mass. Rep., 308,) the ship's register was left behind, and a loss by capture ensued; and though it is not pretended that the decision in this case can be reconciled with the doctrine since established, yet the remarks of Judge Sedgwick will show, that the breach of the supposed warranty of the competence and skill of the master is principally relied on to discharge the underwriters. "The principle of an implied warranty," says Judge Sedgwick, "on the part of the assured, that everything shall be done to prevent a loss, pervades the whole subject of marine insurance, or, in other words, that the insurer shall be responsible for no loss but such as is occasioned by some of the perils which, according to a fair construction of the contract, was, in the understanding of the parties, insured against. Hence is the principle, that the insurer shall answer for no loss resulting from the gross negligence or ignorance of the master, or from the want of a competent crew: hence also, the insurer is not liable for any loss or damage which may happen to goods from any fault or defect of the ship, not arising from the violence of the wind or sea, or from an accident or misfortune in the voyage, but from a latent defect before she sailed; hence, too, there is an implied warranty that the ship shall proceed in the usual and common route, and therefore, a deviation from it discharges the underwriters."

Here the learned judge lays down principles to which, in the main, no exception can be taken. The general principle, that it is the duty of the assured to do everything, on his part, to prevent a loss, is a sound one: among other things, it

is his duty to provide his vessel with a competent master, and if he employs an incompetent or unskilful one, he must bear the loss which results from the ignorance, misconduct or mistakes of such agent. But when the assured has performed his duty in this behalf, and has selected and employed a master of ordinary prudence and skill, it would seem that he had complied with his whole duty, and had fulfilled his part, not only of the letter, but the spirit of his contract. When, therefore, the judge goes further, and requires the insured, not only to comply with his express warranty, by employing competent agents, but to warrant that his agent shall not, during the voyage, be guilty of any act of negligence, unskilfulness or misconduct, he is imposing an obligation upon the assured not to be found in the contract, nor fairly to be inferred from it, and is making him responsible for the very acts and contingencies against which he seeks an indemnity.

The case of Grimm *vs.* The Phœnix Insurance Company, 13 Johns. Rep., 451, is the strongest case we have seen to establish the doctrine, that a loss by fire, proceeding from the negligence of the master and mariners, is not a loss within the policy, though barratry be one of the risks. That case was decided in 1818, and by a court of eminent ability. We will only remark upon it, that the facts upon which the judgment was founded presented a case of the grossest negligence, though the opinion of the court is placed on the general principle, that underwriters have no concern with the competency or skilfulness of the master and crew, and *therefore,* any loss occasioned by the carelessness or negligence of these agents does not fall upon the underwriters. This conclusion is not, we think, warranted by the premises. We will only add, that it is somewhat remarkable that the Supreme Court of New York, and the Court of King's Bench, about the same time, from the same premises, arrived at conclusions exactly opposite. Whilst the Court of King's Bench consider the insertion of barratry as one of the perils insured against, as affording the strongest grounds for concluding that the underwriters intended to be responsible for every inferior degree of carelessness or misconduct, the Supreme Court of New York regard that circumstance as furnishing a violent presumption that every such negligence and misconduct as did not amount to barratry was not covered by the policy. The decision of the English court is now most generally sanctioned, but the reasons given for the decision, in Burk *vs.* Royal Exchange Company, (the case referred to) are certainly not satisfactory, and the New York court was much better warranted, if the clause concerning barratry was to control the decision, in a different conclusion. The case in New York was afterwards reviewed by Judge Johnson, in the Patapsco Insurance Company *vs.* Coalter, and the opinion was disregarded by the Supreme Court of the United States.

Upon the whole, without referring particularly to the other cases to which the appellant's counsel has cited us, we are disposed to adopt the views taken by Judge Story in Waters *vs.* The Merchants' Insurance Company. No late case in New York has been cited, from which it could be seen, whether that court would now adhere to an opinion running counter to the current of modern authorities; nor are the cases in Massachusetts of so decisive a character upon the

precise question arising in this case, as to afford any obstacle to an ultimate adoption by that tribunal, of the generally-received doctrine. In Ohio, as we have seen, the Supreme Court of that State has readily yielded to the force of authority and reason, notwithstanding several opposing decisions of the same court upon the precise question. The doctrine is firmly established in England and in the Federal courts. Under these circumstances, the case being of the first impression here, this Court cannot hesitate, especially as we venture to affirm that the doctrine is most consonant to the terms and spirit of the policy of insurance, and commended by every principle of sound public policy.

. The second point made by the appellants is founded on the eighth plea. That plea alleges, that, at the time of the loss, the boat was not in the possession or under the control of the master, officers or crew, or any of the servants or agents of the owners, but under the control of certain workmen and laborers, with the privity and consent of the plaintiffs. The question is, whether this is any breach of the warranty, that the boat shall be competently provided with master, officers and crew. It is certainly the duty of the owners to see that the vessel is repaired, when repairs are necessary, and it is not charged that repairs were in this case unnecessary, or that any unusual or illegal mode or plan of repairs was pursued: nor is it pretended, that a boat placed on a dry dock, for repairs, should have a full complement of officers and crew; but it is urged, that the owners should have at least some one to attend to their interests, and watch the safety of the vessel, whilst it is undergoing repair. Now, if we are compelled to give the warranty a literal construction, the presence of a single watch, on the part of the owners, would surely not be a literal compliance with the warranty; for master, officers and crew are all required. But to contend that a vessel on shore, or laid up on dock, must have the same number of hands which would be necessary to enable her to pursue a voyage, would be so manifestly against the true intent and meaning of the contract of insurance, that it is not urged. If the vessel was abandoned, on shore, to the hands of strangers, or was hauled on shore, and converted into a shop or store, as was suggested in the argument at bar, such a state of facts would clearly discharge the underwriters, because it was not contemplated in the policy that the boat should be appropriated to any such purposes. But it is within the contemplation of both parties, that the boat will need repairs, and for that purpose, that it must be delivered over to the care and custody of the mechanic who undertakes the work; and it is not shown that it is customary or proper that the owner should appoint an agent to watch the boat or the workmen, whilst in this condition. If there be such a custom, it should be pleaded: *prima facie*, I should suppose it unnecessary. Such is not the law or custom in relation to other bailments; and if there be any custom which requires it, in the cases of boats or vessels, it should be shown.

The next point we will consider, is the fifth point made in the appellants' brief, and involves the sufficiency of the additional plea. The same defence attempted to be set up in this plea, is also contained in some of the other pleas; but as the additional plea contains a more minute and perfect statement, and is not liable to some objections which are urged against the others, we shall con-

sider this plea only, as embracing a statement most favorable to the appellants. This plea, in substance, alleges, that whilst the boat was on the St. Louis Dry Dock for repairs, the workmen unnecessarily and improperly made a fire in the stove, and unnecessarily and improperly placed and spread a large quantity of picked oakum near to the said stove, by means of which the risk of firing the boat was increased, and whilst in this situation the loss happened. The defence is designed to embrace a mere variation or increase of risk, and a loss during, but not the consequence of such increase or change of risk. We are not disposed to deny the general proposition, that a variation or increase of risk will, in some cases, perhaps in all cases where such increase of risk is the cause of loss, discharge the underwriters. It is upon this principle that a loss from deviation falls upon the owners. It is because such variation is against the letter or the intent of the policy. Thus, in the case of an insurance against fire on land, the house insured is described in the policy as a brick-house separate and apart from other buildings, covered with tin, &c., and the insured builds a frame-house immediately in contact with the house insured. The frame building takes fire, and the fire is communicated to the house insured. Here has been an increase of risk, by the act of the insured, against the obvious intent and meaning of the policy, and the underwriters might well claim an exemption from such losses. (Stetson *vs.* Massachusetts Mutual Fire Insurance Company, 4 Mass. Rep., 330.) So also, where an insurance is effected on a voyage, the termini of which are designated in the policy, a deviation from the usual course of such voyages discharges the underwriters, upon the principle that the risk is varied, whether increased or not, and is not the same contemplated by the parties.

Admitting this general principle, we are yet constrained to view the additional plea as a mere plea of negligence, and that it does not contain the allegations necessary to bring it within the class of cases in which a variation of risk is admitted to be a good defence. The plea alleges negligence and misconduct, setting forth the circumstances in which that negligence consisted. It avers, that whilst the boat was on the dry dock, the workmen engaged in making repairs, unnecessarily and improperly made a fire in the stove, and unnecessarily and improperly spread picked oakum near said fire, and that this enhanced the risk of setting fire to the boat. Had the plea alleged that the boat was unnecessarily and improperly placed on the dock, and that, whilst in that situation, the workmen unnecessarily and improperly built a fire, &c., it might have been regarded as of the character designed, and the defendant must have taken issue upon it, or set up a special custom, authorizing the boat to be placed upon such dock. As it is, it is difficult to distinguish it from a special plea of negligence, and therefore involves the same question heretofore considered.

As the declaration contained no averment that the boat was competently provided with master, officers and crew, and the defendants' demurrer reached back to the declaration, the judgment upon the demurrers should have been for the defendant.

The judgment of the Circuit Court is therefore reversed, and the cause remanded.