82  363
85  216
82  363
88  445

## MARY A. HUTCHINS *vs.* CHARLES W. FORD.

### Lincoln. Opinion February 19, 1890.

*Marine insurance. Barratry. Negligence. Shipping. Evidence. Expert.*

The policy written by the Portland Lloyds covers barratry of the mariners, but not of the master when the insured is an owner of the vessel.

In a suit upon such policy, it is not necessary to negative in the declaration the limitation clause which exonerates the subscribers from liability beyond the contributed capital paid in and the undivided premiums. That is a matter to be used in defense.

As bearing upon the seaworthiness of a vessel engaged in the coastwise trade, it is competent for the master to testify in relation to the selection of his mate, "I had every reason to suppose the man was sufficient for a coasting mate. I believed at the time he was capable."

The master of a ship who is a part-owner may be guilty of barratry towards his co-owners, so as to avoid a policy of insurance written in their favor, that does not cover the risk of barratry of the master.

A marine policy covers negligence of the master and mariners.

A verdict will not be disturbed when the evidence sustains it, and shows that the stranding of a vessel did not result from the barratrous acts of the master, but rather from his irresponsible condition occasioned by temporary insanity, resulting from exposure, potent drugs, loss of sleep, or excessive drinking of liquors, or by all of them combined.

The conduct of the mate in not assuming command when the master thus became incapacitated, is excusable, upon the ground of erroneous judgment of his duty.

*Semble,* that barratry of the mate upon whom the command of a ship devolves by the incapacity of the master, during a voyage, will not avoid insurance covering barratry of mariners, but not that of the master.

*Held,* that the statements of the master, as he was about to go below at the end of a storm, giving his reason therefor, are admissible as a part of his act in relinquishing command of the deck for the time being.

The testimony of an experienced seaman, relative to proper measures which should be taken to prevent stranding, is competent as bearing upon the proper navigation of a vessel,—a question wholly for the jury to consider.

The opinion of a physician, called as an expert, who has not made a special study of mental diseases, may be excluded in questions of insanity.

ON MOTION AND EXCEPTIONS.

This was an action upon a policy of marine insurance issued by the association known as the Portland Lloyds. The plaintiff's interest, as part owner of the brig Emily T. Sheldon, was covered by a policy thereon for fifteen hundred dollars; and she sought to recover from the defendant, as one of the subscribers to the policy, his proportional part.

The first count in the declaration alleged that the defendant and others, in consideration of the premium therefor paid "made a policy and entered into an agreement and contract of insurance in writing, wherein is contained, that the plaintiff on account of whom it concerned, did make insurance and cause herself to be insured, lost or not lost, the sum of fifteen hundred dollars, to be paid in case of loss to the plaintiff or her order on said brig, at and from said Boothbay to Annapolis, in the state of Maryland. And the defendant thereby promised to insure for the plaintiff said sum, upon said brig for said voyage, against the perils of the sea, and other perils in said policy and agreement mentioned."

The second count alleged that the defendant, in consideration of the premium therefor paid to him by the plaintiff, "made a

policy of insurance on said brig from said Boothbay to Annapolis, in the state of Maryland, and thereby, in his own proper name, promised to insure the plaintiff thirty dollars, and by the name of Charles W. Ford, attorney, promised to insure the plaintiff other thirty dollars, being sixty dollars in the whole, upon said brig, for said voyage against the perils of the seas, etc."

The material portions of the policy are as follows :—

"Touching the adventures and perils which the said assurers are contented to bear, and take upon them in this voyage, they are of the seas, fire, barratry of the master (*unless the insured be owner of the vessel*), and of the mariners, and all other sea perils and misfortunes which have or shall come to the damage of said vessel, or any part thereof, to which insurers are liable by the rules and customs of insurance in Boston."

"And whereas, the said several assurers hereinafter named as subscribers, have originally subscribed and paid in, or caused to be secured, the sum of one thousand dollars each, to be held as a fund for the payment of losses upon policies issued by said assurers, it is hereby agreed between said assurers, each for himself, and said assured that in no event shall the said several assurers named in this policy, or either of them, be liable to the insured in case of loss under this policy, in a sum greater than such amount of the said sum of one thousand dollars so subscribed by said assured, and his proportional part of the premiums held for the payment of losses as shall at the time such loss shall finally be decided to be due and payable, remain undivided, and unexpended for the payment of losses; and when said fund and accrued premiums remaining undivided, shall be expended in the payment of losses upon risks taken by the assurers, no further claim shall be made or recovered by said assured against the assurers named in this policy, or either of them."

The defendant objected to the admission of the policy, at the trial before the jury, because it had no probative force; and contended that the two clauses above recited constituted a limitation and condition of insurance different from the contract set out in the writ; also that there was a variance between the contract and the proof.

The presiding justice overruled the objections, and the defendant excepted.

The case was submitted to the jury upon two issues. First, whether the vessel insured was seaworthy. Second, whether she was lost from a peril of the sea. The verdict was for the plaintiff and the jury specially found, under the directions of the court, that drunkenness of the master was not the proximate cause of the disaster.

The defendant contended :—

1. That inasmuch as the insured was an owner, the policy did not insure against the barratry of the master or his barratrous acts, and that these would arise either from the wilful act of the master who was the agent of the insured, or by such gross misconduct and negligence, in the management of the vessel, as to constitute a fraud upon the insured if the vessel was lost in consequence thereof.

2. That if the claim of the master that he became insane by taking quinine was true, and the vessel was lost by reason of his acts during his insanity, that such insanity was not a peril insured against in the policy, and the plaintiff could not recover.

3. That the drunkenness of the master, so long as the insured was the owner, was the act of the owner and constituted such gross misconduct as to afford a defense to this policy;—in other words that it was not a peril insured against.

4. That if the condition of the captain was such as he claims, it was clearly the duty of the mate to take charge of the vessel when he saw that it was to be wrecked through the acts of the master ; that if he was not competent such incompetency affected the seaworthiness of the vessel ; and if the vessel was improperly manned in this respect, then the plaintiff could not recover.

The defendant's exceptions to the admission of testimony and the charge of the presiding justice are stated in the opinion.

*A. A. Strout, L. M. Staples*, with him, for defendant.

If the vessel was lost through the insanity of the master the defendant was not liable. 1 Parsons, on Marine Ins. 574. *Lawton* v. *The Sun Mutual Ins. Co.*, 2 Cush. 500.

Gross and culpable negligence on the part of the master con-

stitutes a barratry, and is a defense. 1 Parsons on Marine Ins. 568. *Ellery* v. *Ins Co.*, 8 Pick. 21; *Levi* v. *New Orleans Ins. Co.*, 2 Wood, 63.

Insanity, caused by taking quinine or by drinking intoxicating liquors is not a peril of the sea, insured against by a policy like the present. *Cleveland* v. *Ins. Co.*, 8 Mass. 308 ; *Dixon on Marine Ins.*, 163 ; *Ins. Co.* v. *Sherwood*, 14 Howard, 351; *Schooner Reeside*, 2 Sumner, 567; *Coles* v. *Marine Ins. Co.*, 3 Washington, 159 ; *United States* v. *Hunt*, 2 Story, 125.

*O. D. Castner*, *W. Gilbert*, with him, for plaintiff.

Counsel cited: *Nelson* v. *Suffolk Ins. Co.*, 8 Cush. 496 ; *Copeland* v. *N. E. Marine Ins. Co.*, 2 Met. 432 ; *Waters* v. *Ins. Co.*, 11 Pet. 213 ; *Ins. Co.* v. *Transportation Co.*, 12 Wall. 194 ; *Ins. Co.* v. *Glasgow*, 41 Am. Dec. 661, 668, 670 ; *Street* v. *Ins. Co.*, 75 Am. Dec. 714-6-7 ; *Parkhurst* v. *Ins. Co.*, 100 Mass. 301, 305. The general tendency of modern decisions is, not to hold the owner, who has complied with the warranty of seaworthiness, responsible for the negligence of the master or crew, upon the voyage.

Exceptions to evidence: *Com.* v. *Rogers*, 5 Met. 500, 505 ; *Com.* v. *Rich*, 14 Gray, 335 ; 1 Greenl. Ev. § 440.

HASKELL, J. Assumpsit on what is known as a Boston policy of marine insurance, written on the plaintiff's interest in the brig Emily T. Sheldon, to recover two fractions of the amount insured thereon. Among the risks underwritten were perils of the seas, including barratry of the master, unless the assured be an owner. The policy was signed by fifty associates, known as the Portland Lloyds. They respectively promised severally and not jointly,—each for his specified fraction of the sum insured ; so that a suit upon the policy cannot be maintained against the underwriters jointly, but each one must be sued severally for his fraction of the insurance. The verdict is for two fractions or fiftieths of the sum insured, on account of the loss of the vessel from stranding.

I. It was objected at the trial that the policy should not be admitted in evidence for the want of "probative force." It is now contended that it was erroneously admitted, because a limi-

tation contained in the policy, of each subscriber's liability to $1,000 paid in and premiums undivided, was not covered by proper averments in the declaration, showing the defendant's liability.

The contract of insurance is absolute. The limitation relied upon is not a condition precedent to be complied with before the policy becomes operative and, therefore, to be met by apt averment before a case could be stated showing the defendant's liability under it; but rather a stipulation to excuse liability already incurred. At the date of the policy, the limitation clause might not exonerate the underwriter from liability, while at the time of loss, perhaps months or years afterwards, it would afford an ample defense; meantime, the assets provided by the underwriter for the payment of losses may have been completely absorbed.

II. It was denied at the trial that the vessel insured was seaworthy at the inception of the voyage. As bearing upon this issue, exception was taken to the testimony of the master, in substance, that he acted in good faith in selecting his mate and believed him competent for the place. The integrity of the master seems to have been assailed throughout the whole trial, and his discretion and good faith in fitting and manning the vessel for sea is so clearly connected with, and so nearly becomes an element in the fact of seaworthiness of the vessel, that the testimony could not properly have been excluded. He testified: "I had every reason to suppose the man was sufficient for a coasting mate. I believed at the time he was capable." This testimony tends to show the good faith of the master, and, while it may not prove the competency of the mate, it negatives any reckless or corrupt action of the master in selecting him, and bears strongly upon the issue of the seaworthiness of the vessel.

III. It is contended that the vessel was stranded and lost by the fraud of the owners, inasmuch as the master was part-owner and incapable of barratry. Now barratry of the master was not a peril insured; and if he was incapable of committing that crime, because he was a part-owner, then the insurance holds, unless his acts as owner destroyed the insurance of his co-owners, who were

innocent of personal fraud. No case has been cited at the bar sustaining such doctrine.

Barratry has been defined to be knavery towards the owners. It is plain that the master of a ship, who is the sole owner, cannot commit a fraud upon himself. He cannot act without his own knowledge and consent, and, therefore, cannot commit barratry. *Wilson* v. *Ins. Co.*, 12 Cush. 363. But, when he is a part-owner only, the same reasons do not hold, although the contrary is held in the case last cited. That case, however, stands alone, without authority in its support, so far as we have been able to discover. The judgment of the court of the exchequer in *Jones* v. *Nicholson*, 10 Exc. 28, rendered in 1854, the next year after the Massachusetts case, by Pollock, C. B., and Alderson, Platt, and Martin, BB., is the better reason. The court says:— "Some expressions of modern authors to the contrary have been cited, but they are in truth no authority whatever since the doctrine laid down is not supported by any decided case. A master who is sole owner cannot commit barratry, because he cannot commit a fraud against himself, but there is no reason why the fact of a master being part-owner should prevent the other part-owners from insuring their interest in the ship, or the freighters from insuring their goods. If a master being part-owner makes away with the ship, that, in my opinion is barratry. The whole principle on which the doctrine rests supports that view. * * * Whenever it is a fraudulent act on the part of the master, it is barratry; but it cannot be a fraudulent act when he is sole owner. * * * Because the master happens to be a part-owner, how can it be said that the barratry committed by him is not a fraud against the other owners, who have separate shares in the vessel?" The same doctrine is approved in *Phoenix Ins. Co.* v. *Moog*, 78 Ala. 284, s. c. 56 Am. R. 31, and in Par. M. Ins. 571. The recent statute of the United States, severing the liability of ship-owners, weighs against the doctrine of their joint liability and accountability in all cases.

IV. It is familiar law, that insurance becomes payable upon loss from a peril insured; but it is not always easy to determine the precise peril that works the mischief. In this case, the policy

covered perils of the seas, except barratry of the master. There was an implied warranty on the part of the owners that the brig was seaworthy at the inception of the voyage, that is, tight, staunch, strong, properly manned and provisioned, and suitably equipped for the voyage. This implied warranty was a condition precedent to any liability of the insurer, although the burden was upon the defendant to establish its breach, since seaworthiness of the brig at the inception of the risk is presumed. The presumption of seaworthiness at the inception of a risk under a marine policy may be rebutted, either by direct evidence of the ship's actual condition, or by proof of facts from which unseaworthiness may fairly be inferred; and when the latter is shown, the insurance is destroyed, for the policy does not attach, and the premium would be without consideration, and may be recovered back. *Taylor* v. *Lowell*, 3 Mass. 347; *Paddock* v. *Franklin Ins. Co.*, 11 Pick. 226; *Swift* v. *Union Mutual Ins. Co.*, 122 Mass. 573.

The implied warranty of seaworthiness required that the brig should have a competent master and mate, and a sufficient crew for the particular voyage to be entered upon. The jury were so instructed, and must have found all these pre-requisites to have been complied with. Nor can we say that the evidence fails to prove the issue. The master was beyond middle age, and of long and varied experience. The mate had sailed with him once before as second officer, and appears to have been competent to serve as mate for a short coasting voyage. His competency must be determined in relation to the particular service to be performed. The wages usually paid to a coasting mate cannot be expected to command the skill and proficiency that would be required of a competent first officer of a ship, bound upon a long and perilous voyage to a remote part of the globe. No error, therefore, either in law or fact, appears from the record on this branch of the case.

V. The law is now well settled, that disaster, caused by a peril insured against, as stranding or collision, resulting from the negligence of the master or mariners, is covered by a policy of marine insurance. *Liverpool Steam Co.* v. *Phoenix Ins. Co.*, 129

U. S. 397; *Orient Ins. Co.* v. *Adams,* 123 U. S. 67; *General Mutual Ins. Co.* v. *Sherwood,* 14 How. 351; *Waters* v. *The Merchants' Louisville Insurance Co.,* 11 Pet. 213; *Whorf* v. *Equitable Marine Insurance Co.,* 144 Mass. 68; *Nelson* v. *The Suffolk Ins. Co.,* 8 Cush. 477; *Lawton* v. *The Sun Mutual Ins. Co.,* 2 Cush. 500; *Copeland* v. *New England Marine Ins. Co.,* 2 Met. 432; *Street* v. *Augusta Ins. & Banking Co.,* 12 Rich. 13, S. C. 75 Am. Dec. 714; *St. Louis Ins. Co.* v. *Glasgow,* 8 Mo. 713, S. C. 41 Am. Dec. 661; *Enterprise Ins. Co.* v. *Parisot,* 35 O. St. 35; *Henderson* v. *Western Marine and Fire Ins. Co.,* 10 Rob. 164; *Busk* v. *Royal Exchange Assurance Co.,* 2 B. & A. 73; *Walker* v. *Maitland,* 5 B. & A. 171.

VI. When loss from barratry of the master is no part of the risk taken, as in this case, it becomes necessary to distinguish between barratrous acts and acts of negligence, or misconduct not fraudulent, to determine the proximate cause of the disaster; whether it is the direct result of a peril insured against, as stranding, or whether culpable conduct in its nature barratrous, that results in stranding, is the real cause. *Causa proxima non remota spectatur.* Stranding may be the apparent cause, but barratry the real cause. So, in determining the proximate cause, the conditions under which the stranding came about must be considered; and if it cannot be accounted for, but from conduct seemingly designed to produce that result, the conclusion logically follows that design was the proximate cause after all. If, however, the conduct indicating the design be shown to be the act of an insane person, whose reason has departed, then responsibility for the act is excused, and in contemplation of law is not barratrous. It matters not from what cause the insanity comes, nor how permanent it may be. It may result from excessive drinking of spirits, as delirium tremens; or it may come from being deprived of such drinks; or from exposure and loss of sleep; or from the taking of potent drugs. Any one of these causes and many others may dethrone the reason and render a man incapable of rational conduct; and, when so visited, his acts are not those of a responsible person, and bind neither him nor his principals, although, such acts, if done by a sane person, would be

criminal. *Lawton* v. *Ins. Co., supra; United States* v. *Drew,* 5 Mason, 28.

VII. The master, in this case, sailed from Boothbay on the 18th of March, 1886, for Annapolis, Md., and on the 19th encountered a storm of wind, rain, hail and snow, that lasted until midnight of the 21st. Throughout the storm he had no sleep. As the storm wore on it developed into a gale, and the brig was damaged in her sails, and had her rudder-post split, although that was not known until the forenoon of the 22d. Early in the morning of that day, the master, having made Thatcher's Island light, seeing indications of better weather, directed the mate, if the wind came in to the west or southwest, to make sail for Cape Cod lights, and if possible fetch through the south channel and go to sea; and went below for nourishment and sleep. He says that being threatened with fever and ague, contracted in southern latitudes, he took a dose of quinine, fifteen grains, and laid down upon the lounge for sleep; that he has no recollection of anything after that until he found himself in the life-saving station on Cape Cod.

After the master went below, the wind came westerly, the weather cleared, the sea became smooth, but had a heavy swell and strong undertow. The mate made sail, as directed, and headed the brig off the land. The mainsail had been split in the gale, and without it and for the want of it, as the mate supposed, the vessel steered badly. She would hold her course steadily for awhile, and then, without apparent cause, other than the want of her mainsail, would come into the wind and shake her sails. She continued in this fashion until, along in the middle of the forenoon, the captain of a tug hailed the mate: "Your rudder is gone." The mate thereupon went down over the stern in a bowline and found the rudder-post split, so that the wheel had no control over the rudder, and he, not being able to repair the damage, sent for the master to come on deck. The steward called him, and he replied: "All right, I will be up," but did not move. In the course of a half-hour, the steward called him again; he replied: "All right, all right, I will be up there," but did not get up. The steward being directed to call him the third time, seeing

that something was wrong, pulled him off the lounge, got him on his feet, put his overcoat onto him, and helped him on deck about noon. He took the ship's glasses and began to look around. A seaman says: "He acted like a man who was dizzy,—seemed out of his head." He ordered up the topmast stay-sail, being told the rudder was gone. That brought the vessel into the wind and headed her for the shore. The mate ordered it down, thereupon, the master threatened the crew with the penalties of mutiny and ordered it up. Two tugs successively offered aid, but the master refused both. The captain of one told him that his rudder was broken and that his vessel would not steer, he replied that he knew all about that and did not want any of his help. He refused to eat any dinner, but went below and got a muffler, and the steward helped him wind it about his neck. He remained in charge of the deck until the brig stranded on Peaked Hill Bar, on the back side of Cape Cod, at about three o'clock in the afternoon, under sail and without having let go her anchors. Witnesses from other vessels in the vicinity report the brig as heading in all directions, as the sails that went up and down might steer her. The testimony is conflicting as to what took place on board the brig after the master came on deck, but indicates the conditions before stated. The evidence shows that the master seemed wrong for two or three days after the disaster; that he acted strangely, although he assumed the charge of the wreck. There is no evidence of the smell of liquor about the master, nor that he had drank any, other than what might be inferred from finding two or three empty bottles in his cabin, supposed to have once contained it.

It was contended at the trial that the master was drunk and therefore responsible for the stranding; and, although the court instructed the jury that drunkenness of the master was no defense to the action, the jury found specially, that it was not the proximate cause of the disaster.

Now drunkenness *per se* was an immaterial issue in the case. As an abstract rule of law the instruction was correct; but consider the instruction to relate to such conduct of the master as shown in this case, and it may be or may not be correct. Its

correctness depends upon the construction given to the acts of the master. If they show design to strand the vessel, then drunkenness does not excuse them, and they are a defense, and the drunkenness of the master becomes immaterial. If they fail to show design, but only negligence, as bad seamanship or mistake, then drunkenness is no defense. Intoxication may cloud the brain, dull the perception, confuse the mind, and impair the judgment, and still not absolve the insurer from paying a loss resulting from the misconduct of a ship-master, while in that condition, not shown to be criminal. Bad seamanship of a drunken master counts for no more than bad seamanship of a sober man in cases of this sort. The test is: Was the act wilful, and does it indicate fraud? If yes, no matter whether done by a sober man or an intoxicated man, the crime is the same. Insanity, only, can excuse it.

It is not pretended in defense but that the master was either drunk or insane. Either responsible or excusable, as the issue may be found. That was the issue tried by the jury, and they negatived the former. It follows, therefore, that the general verdict for the plaintiff stands upon the fact of the master's temporary insanity. And, the more closely the evidence is studied, the more rational the verdict appears to be. In the first place, it is incredible that a sane master, on the outside of Cape Cod, in March, without mainsail or rudder, would have attempted either to go to sea or make Provincetown harbor against a head wind and ebb tide; especially, when tugs were at hand and offered assistance. It is also equally incredible that a sane master, in broad day, in the presence of other vessels, would sail his vessel straight for the shore, and strand her without any attempt to shorten sail or use his anchors swinging at the bows. The circumstances of the stranding point to design as the cause, but not the design of a rational man.

The master rode out a storm from the night of the 19th, until the morning of the 22d, with little sleep on the night of the 19th, and none on the nights of the 20th and 21st. During this time he had taken little nourishment, and on the morning of the 22d, being threatened with fever and ague, to which he was subject, took 15

grains of quinine, not an extraordinary dose for persons afflicted with that disease, and, without food, laid down to sleep. On being called twice, he answered, but rose not. At the third call, the steward found him "wrong," pulled him off the lounge, got a coat on him and helped him on deck. He was told of the disabled rudder, but did not seem to comprehend it. He appeared dizzy,—like a man out of his head. He refused aid from two tugs that successively offered to relieve his peril. He ordered sail, heading the vessel for a dangerous shore. When that sail was shortened by the crew, who must have seen the danger, he charged them with mutinous conduct, and ordered the sail reset; and finally, he sailed the brig onto a bar of sand, in full view, on the dangerous shore of Cape Cod, where no sane man would have put her, unless he were a knave. He had to be coaxed from his vessel on a life-boat, and for two or three days seemed unnatural while at the life-saving station. This whole conduct and demeanor of the master is so unreasonable and unnatural, and the evidence shows such insane conduct, that the court cannot say that the verdict was wrong, and that the acts of the master, resulting in the stranding of his brig, were those of a rational mind.

VIII. Barratry of the mariners was a peril insured. If, therefore, the conduct of the mate in neglecting to assume command in season to prevent the stranding, when it had become plain that the master was incapacitated and incompetent for command, be considered culpable negligence, or fraudulent even, still, the insurance of the plaintiff will hold.

Had the vessel been lost from the fraud, or crime of the mate, while the master was competent and in command, the insurance would have become payable to the plaintiff, because the vicious conduct of the mate was a peril covered by the policy, and a risk that had been paid for. He bore no confidential relation to the owners. They had neither appointed him to the command of their ship, nor made him their agent. Necessity clothed him with cumulative duties, but he still retained the station and grade affixed to him by the ship's papers. He was still mate,—mate in command, acting master *pro hac vice.* He still

retained his lien as a mariner for his wages, enforceable in the admiralty. *The Brig George*, 1 Sum. 151; *Reed* v. *Chapman*, 2 Stra. 937; *The Favorite*, 2 Rob. Adm. 192; *Tate* v. *Protection Ins. Co.*, 20 Conn. 481; *The Fanny Gardiner*, 5 Bissell, 209; *Copeland* v. *N. E. M. Ins. Co.*, 2 Met. 432. Seemingly *contra*, *Hanson* v. *Royden*, 3 Com. Pleas. 47.

But, if this were not so, although it may have been the duty of the mate to have seasonably assumed command and saved the brig from her peril, his act, if it be considered the act of a master, is not shown to have been of that culpable character to be considered barratrous, and work a destruction of the plaintiff's insurance.

The mate's failure to interfere may have been a breach of duty; but, if it resulted from negligence, from erroneous judgment of duty, it could not have been fraudulent and absolve the insurer. Did he, being aware of the peril, purposely refrain from command to allow a stranding of the brig? If he did, then his act was criminal and barratrous; and if it be considered the act of the master, within the meaning of the policy, then the insurer is discharged from liability under it.

It must be remembered that the verdict finds the vessel to have been seaworthy at the inception of the voyage. The jury were expressly told that, if the brig sailed without a competent mate, she was unseaworthy, and the plaintiff could not recover. The conduct of the mate, before the stranding, is evidence strongly tending to show his incompetency; but on the other hand, the whole evidence satisfied the jury of his competency, and the court considers the verdict sustained by the evidence; so that, assuming the competency of the mate, it is to be considered whether his conduct, after the command had been cast upon him, was simply negligence and not criminal; and it must be noticed, that no motive has been shown to induce a criminal act. It must be considered, too, that the mate was placed in an embarrassing position. It was a delicate matter for him to assume command in contempt of the master's authority, and might result seriously to himself, should he misjudge the matter, and take to himself authority that could not be justified by proof, at the end of the

voyage, when the master's reason might return, and not aware of his own previous condition, accuse the mate of mutinous conduct, as he did do on the deck, when the mate ordered a sail to be lowered that the master had just ordered up. The whole evidence indicates that the mate misjudged his duty, rather than that he wilfully and fraudulently connived at allowing an irresponsible and deranged master to cast the vessel on shore.

The words of Chief Justice Shaw, in *Copeland* v. *New England Insurance Co.*, 2 Met. p. 449, are apposite. He says : "It is very clear, in this case, that the immediate cause of the loss was stranding, * * which is one of the perils insured against; and the case supposed is, that this was caused by the mate in not assuming the command. This default must consist either in a want of judgment in perceiving and determining that the master had become so deranged, or incapacitated, as to authorize and require him to interfere, or in negligence in the performance of his duty, when the case occurred. Such a case may occur in every voyage, and must be considered as one of the contingencies incident to navigation. It may often present questions of great difficulty, in acting on which, mistakes, on the part of the officer second in command, may occur. * * I cannot distinguish the negligence of the mate in the case supposed from his failure in the performance of any other duty as a nautical man. * * For the performance of these duties, we are of opinion that the owners, as between themselves and the underwriters, are not responsible. A contrary doctrine would lead to questions of great difficulty, involving numerous questions of fact, of very difficult proof, as to the skill and seamanship of all the nautical measures taken in the whole conduct of the voyage. Besides, these mistakes of judgment and instances of negligence are incident to navigation, and constitute a part of the perils that attend it; and they can no more be restrained, prevented, or guarded against, by the owners, than by the underwriters. The most cautious foresight can only enable owners to provide a competent crew of officers and seamen at the commencement of the voyage. What reasons, then, are there of justice or policy, what considerations growing out of the nature of this contract, or the relations of the

parties, which should prevent the owners from insuring them-
selves against this peril?"

IX.  Exception is taken to the admission of the master's state-
ment as he was about to go below on the morning of the 22d:
"I feel tired and am worn out.   I think I will take some quinine
and see if I can't get a chance to sleep.   I have not,—slept for
three days."   This was clearly a part of the res gestae, and ad-
missible as such.

X.  Exception is taken to the testimony of one of the seamen,
a man of four years' experience, serving as cook and steward.

Q.  "Now I will ask you to state whether there was any thing
different from what the mate did that could have been done to
keep the vessel from running ashore?

A.  No sir.   I do not know what could have been done.   I do
not know that the mate could have done anything else."

The witness was of sufficient experience to give his opinion as
to what nautical measures might have been taken to prevent
stranding; and to these, the question and answer wholly relate.
The weight of the testimony was for the jury.   Directly in point
is the case of Union Ins. Co. v. Smith, 124 U. S. 400–423.

XI.  Exception was taken to the exclusion of a question put
to a physician as an expert on insanity.   The question might
have been excluded for two reasons.

First, it was complicated and involved, covering a half octavo
page, and contained matter not pertinent to expert testimony;
and, second, the witness does not appear to have been an expert
on insanity.   He says:   "I have not made it [diseases of the
mind—mental diseases] a special study, only as a general prac-
titioner."   This is one ground given by the court below for the
exclusion of the testimony, and does not require revision here.
Fayette v. Chesterville, 77 Maine, 28.

*Motion and exceptions overruled.*

PETERS, C. J., WALTON, VIRGIN, EMERY and FOSTER, JJ.,
concurred.