SEAMAN *v.* ENTERPRISE FIRE & MARINE INS. CO.[1]

*(Circuit Court, E. D. Missouri.   September 25, 1884.)*

1. INSURANCE—INSURABLE INTEREST OF STOCKHOLDER IN CORPORATE PROPERTY.
   An owner of stock in a corporation has an insurable interest in the corporate property in proportion to the amount of his stock.

2. SAME—WHERE THERE IS A SHAM SALE.
   This interest, though extinguished by a *bona fide* sale of the property, is not altered by a sham sale.

3. SAME—EVIDENCE.
   The bill of sale and the enrollment of a steam-boat are *prima facie* evidence of a *bona fide* sale.

4. SAME—IMPLIED CONTRACT AS TO SEAWORTHINESS.
   There is an implied contract on the part of the insured of an interest in a vessel for a particular voyage, that she shall be seaworthy when she leaves the port of departure, and that if she becomes unseaworthy while on her voyage the master shall use a reasonable discretion and have the defect remedied at the nearest convenient port.

5. SAME.
   The necessity for haste in making repairs, in case the vessel becomes unseaworthy during her voyage, depends upon the character of the defect: the more serious it is the greater the necessity for prompt attention.

6. SAME—PRACTICE.
   The question of whether or not reasonable diligence has been used in a given case is for the jury to decide.

7. SAME.
   The fact that a vessel was unseaworthy when it left the port of departure, or became so afterwards, and due diligence was not used in having her repaired, will not prevent a recovery by an insurer in case of loss, unless the loss has been contributed to or caused by the defect.

8. SAME—PERILS OF NAVIGATION.
   Perils in making landings are perils of navigation.

9. SAME — AMOUNT OF STOCKHOLDER'S INSURABLE INTEREST IN CORPORATE PROPERTY.
   Where a party who owned three-sixteenths of the capital stock of a corporation insured his interest in the corporate property, *held*, that in case of loss he was entitled to recover the amount of his policy, up to three-sixteenths of the value of such property at the time of the loss.

Suit upon a policy of insurance upon a steam-boat owned, as alleged, by the C. V. Kountz Transportation Company.   The insured vessel, while making the trip specified in the policy, accidentally struck the river bank, in attempting to make a landing, and was so injured that she sank and became a total loss.   The other material facts and the points made in the defense sufficiently appear from the charge.

*Madill & Ralston,* for plaintiff.

*Given Campbell,* for defendant.

BREWER, J., *(charging the jury orally.)*   This plaintiff claims to be the owner of 74 shares of stock or three-sixteenths of the stock of this company, and that, by reason of that ownership, he has or had

---

[1] Reported by Benj. F. Rex, Esq., of the St. Louis bar.

an insurable interest in this boat to that extent. His interest arises or arose by virtue of the fact that he owned the stock in the corporation, — the Kountz Transportation Company, — which corporation owned the boat. As the owner of the stock he had a right to insure his proportionate interest in the boat; that is, if he owned three-sixteenths of the stock he could insure three-sixteenths of the boat, and if the boat, at the time of the loss, belonged to the transportation company, he had an interest to be protected by this policy. It is claimed that there was a sale of that boat by the company prior to the loss. In support of that a bill of sale is produced. The enrollment is produced. *Prima facie* that bill of sale and that enrollment show that there was a sale; and when I say *prima facie*, I mean that if there were no other testimony in the case you would be bound to find that the boat had been sold by the transportation company, and that this plaintiff had no interest in the boat. But the plaintiff says, and the burden of proof is on him to establish what he says, that there was in fact no sale, no honest *bona fide* sale, by the transportation company. As a stockholder he would be bound by an honest sale, whether he liked it or not, and he must take, if such a sale was made, simply his interest in what was received; for you can very easily see, in that respect, that, if the company had sold the boat and gotten so much money, it would be unjust for him to have an interest in that money and still have an insurable interest in the boat which did not belong to the company and which did belong to a third party. So the question is whether this transaction, which took place in New Orleans, was by the company a *bona fide* sale. If it was a mere sham, a mere putting up of papers, a mere going through the form of a sale in order to place the apparent title in some third party to prevent seizure, or for any other reason, then that kind of a sale does not conclude him. Whatever might be true of the corporation, as a stockholder, he might say, I never authorized the president, or any other officers, to go through the form and trick of a pretended sale; that property still belongs to the corporation,—at least, so far as the protection of my interests are concerned.

I shall not review the testimony in detail as to what took place at New Orleans, nor endeavor to criticise or comment upon it. It is very full, and I think you will have no difficulty in arriving at a conclusion as to whether that was a sham sale, — a mere putting of the title in the name of an alleged purchaser, Charles B. Jones, for the sake of avoiding liabilities there,—or a *bona fide* sale of the property, vesting the title and ownership of the boat in C. B. Jones. In reference to such a transaction, generally, I may say that a sale cannot be consummated without the assent of the seller and the purchaser; I cannot force upon either one of you the title to property which I own, no matter what papers I may execute. You have a right to *be consulted* in the determination of the question whether you will take the title. But if there was at the time, with the assent

of the corporation through its president, who had authority to make a *bona fide* sale, and the assent of the purchaser to whom this sale it is claimed was made, an honest *bona fide* sale of the property, the rights of the plaintiff in the boat ceased, and your verdict must be for the defendant. If, on the other hand, it was a mere trick, a mere pretense, a mere going through with the form of a conveyance, without any intention that the property should be the property of the purchaser, an intention entered into and assented to by both seller and the purchaser, then it is no sale so far as this is concerned. As I said, or intended to say, and I repeat it in order that there may be no mistake about it, the enrollment and the bill of sale are *prima facie* evidence of the transfer of the title, and unless the testimony satisfies you that there was no *bona fide* sale, the verdict must be for the defendant.

The other question runs as to the accident itself. It is claimed by the defendant that this boat was not seaworthy when she left the port of departure, and not seaworthy at the time of the accident, and the question is, what is seaworthiness? because, as a matter of law, whether expressed or not in the policy, there is an obligation on the part of the boat—the owners of the boat—to see that when she leaves the port of departure she is seaworthy, and this plaintiff, although he may not have been an officer or present here to examine, yet is bound by that obligation. It is a part of the contract of insurance that the boat shall be seaworthy when it leaves the port of departure, which in this case was St. Louis. And that is fair when you stop to think of it a moment. The insurer has no possession of the property; in this case it is a corporation residing elsewhere, and it could not be present and examine the condition of every boat it insured. It is the duty of the owners to themselves see that it is seaworthy when it leaves the port of departure.

Now, what is seaworthiness? In order that a boat should be seaworthy it is not necessary that it should be provided with everything that would be convenient and pleasant to have on the boat in its voyage, but it is necessary that it should be provided with everything which will tend to make it reasonably safe for the voyage which it is intended to make. It will not do to say that because the thing can be done,—a voyage can be made without this or that, —that therefore a boat is seaworthy. Take an illustration outside of the river: A vessel crossing the ocean should be provided with its masts and rigging,—all the masts and rigging which that vessel ordinarily carries, which are reasonably necessary for the movement of that vessel; and while you and I may know, as a matter of fact, that many a vessel has been carried across the ocean safely with two-thirds of its masts and the bulk of its rigging gone, yet you cannot say of such a vessel, that it was seaworthy: it had not been put in that condition which prudent and reasonable seafaring men would require in order to encounter the perils and dangers which might be

expected. So, when this boat left the port of St. Louis, it should have been put in that reasonably safe and prudent condition which, having in view all the perils which might reasonably be expected it would encounter in the voyage, was sufficient to guard against those perils.

The particular complaint of the condition of the boat is the lack of the starboard wing rudder, and much testimony has been given before you as to the necessity of such a rudder, and its value in controlling the motions of the boat; testimony has also been offered to the effect that boats are built and managed without any wing rudders. Now, the question in that respect is, not whether a boat could be managed without any wing rudders, or with only one wing rudder, or whether other boats are constructed with only balance rudders, because, as you will remember, the testimony developed before you that there was some difference in the shape of the sterns of these different boats,—some with skaggs and some without. The question is whether, as to this boat, considering the size, the manner in which it was constructed, the size of the balance rudders, the amount of load which it might reasonably be expected to carry, the condition of the river, and the perils of the voyage it was to make, it ought reasonably and fairly to have had the four rudders at the time it left the port of departure, or anywhere along down the river. If you say, from the testimony, that the want of this starboard rudder did not materially affect the steerage power of the vessel, or prevent the pilot from maintaining good control over its motion, why, then, the omission of the rudder at the port of departure, or anywhere along the line, cannot be said to be a lack of seaworthiness; but, if that was a material factor, reasonably necessary, not merely when going down stream, or backing, but in the various contingencies which will arise in the course of a voyage,—if such fourth rudder was reasonably necessary in order to give the proper control of the boat to the pilot, —then the lack of such fourth rudder rendered the boat unseaworthy.

If you find that there was no need of that fourth rudder, that closes the question, you need not go any further; but if you find that that rudder was necessary to make it seaworthy, then the question comes as to the duty incumbent upon a boat, and its officers and owners, in respect to the voyage. The duty is absolute at the port of departure to see that it is seaworthy. If, after leaving the port of departure, the injury happens, then the master of the boat is vested with reasonable discretion. He is not bound, because some little defect happens, to stop his boat. If it was a sea voyage, he could not do it, perhaps; he is not always bound to turn to the nearest port; that will depend on the nature of the injury,—the extent which it affects the ability of the boat to make a successful voyage. He is bound to use a reasonable discretion, and, at the nearest convenient port, to remedy any defect which makes the boat unseaworthy. And what is the nearest convenient port depends upon the facts of the case;

what is the imperativeness of the necessity depends upon the extent of the injury. If it is a little matter, that affects but slightly the voyage or control of the boat, then the necessity for stopping is not so imperative as if the injury is such as wholly destroys the power of control; and it is for the jury in that respect to say whether the conduct of the master was reasonably prudent, if, after leaving the port of departure, and the accident happening after leaving the port of departure, he is informed of the injury.

You must not understand that it is his imperative duty to stop the moment he finds it out, nor is he at liberty to go on indefinitely without seeing it repaired. He must consider all the circumstances under which he is placed, the ability to repair the loss, the place where the loss can be repaired, the condition in which the boat is on account of the stage of water, the amount of load it possesses, the ability of the pilot to control the motion, — and the question is whether, taking all these things into consideration, he acted with reasonable discretion in the matter?

But then, suppose you find that the boat was not seaworthy at the port of departure, or that, becoming unseaworthy after it left the port of departure, the master did not exercise reasonable prudence in repairing the defect, the further question comes, whether the loss was owing to that defect. If the loss was in no manner owing to the defect, then it will be disregarded. Take this illustration: Supposing a boat starts off without sufficient rudders, but the loss comes from an explosion of the boiler, something in no manner connected with that defect, then the existence of the defect does not vitiate that policy. It is only where, there being a defect which makes the boat unseaworthy, that defect, either in whole or in part, causes the injury. So you go down to the time of the loss, and inquire from the testimony what caused it; was it mismanagement on the part of the pilot, or a failure of the engineer to obey the direction of the pilot,—a failing to back when he should have backed, and sending the boat forward? Was it because of the defect in the arrangement of the freight on the boat, so that it was not under the control of the pilot? Was it on account of the state of water? If it was solely caused by other matters than this alleged defect in the matter of the steering capacity, or want of a rudder, then the policy is holden, or the insurer is holden on the policy. It is only when the defect exists, and when it is one which, either in whole or in part, contributes to the loss, that the policy is void; and these are all questions of fact for you to determine.

In reference to them, summing them up briefly, let me say that the papers—the bill of sale and the enrollment—*prima facie* show a transfer of title. The plaintiff must show that the sale was fictitious and a sham. If he has done this, the whole thing may be disregarded, and his right to recover is not affected by that sale. *Second*, the question of seaworthiness is whether the boat was placed or continued in a

reasonably safe and proper condition for making the voyage which it was intending to make. *Third*, the master (if the defect rendering the boat unseaworthy you find occurred after leaving the port of departure) had a reasonable discretion, considering all the circumstances of this case, to repair that defect in as speedy a manner as he could. And, *fourth*, if the defect did not, either in whole or in part, contribute to this loss, it may be disregarded. The injury, as stated by counsel, and very properly, must be one of the perils of navigation; that is, it must have been caused in the navigation of the boat, and flowing from the ordinary perils which come from navigating the river. Included in that is the manner of approaching the landing, as well as moving down the stream.

If you find for the defendant, the form of your verdict will be, simply, "We, the jury, find for the defendant;" if, on the other hand, you find for the plaintiff, the form of your verdict will be, "We, the jury, find for the plaintiff, and assess his damages at" such sum as you name. In reference to the question of damages, if you find for the plaintiff, you will take the value of the boat at the time of the loss. You have heard several witnesses on both sides give to you their opinion as to the value, and the reasons for that opinion, and from that you will determine what the value of the boat was, and award the plaintiff three-sixteenths of that value as your verdict, together with interest from August 10, 1881, at 6 per cent.; that is, you will take three-sixteenths of the value of the boat at the time of the injury, and compute the interest on that at 6 per cent. from August 10, 1881, to the present time, and that, if you find for the plaintiff, will be the amount of his damages; and the form of your verdict will be, "We, the jury, find for the plaintiff, and assess his damages at" that sum.

---

The jury returned a verdict for the plaintiff.

A motion for a new trial was thereupon made by the defendant, and the following opinion was rendered thereon, viz.:

BREWER, J. In this case, which was tried before me the other day, a verdict was rendered for the plaintiff, and a motion made for a new trial. The question involved is this, whether a stockholder in a corporation has an insurable interest in the property of the corporation. Upon that question counsel for defendant says there are but two authorities prior to this case,—one a case from Ohio,—20 Ohio, 174. An examination of that case shows that the question involved was this: Certain stockholders in a corporation insured their property, and in an application represented that the fee-simple title was in themselves, but it turned out that the fee-simple title was in the corporation, and the decision was that there was a breach of the warranty,—a misrepresentation which avoided the policy. At the close of

the opinion there is a *dictum,* and it is only a *dictum,* that a stockholder in a corporation has no insurable interest in the property of the corporation. The other case is in 31 Iowa, 464. There the supreme court, where the question was distinctly presented, affirmed that a stockholder did have an insurable interest. In the present case, the question was raised before my predecessor, upon demurrer to the petition, and he decided that the stockholder had an insurable interest in the property of the corporation. Whether that concludes me or not, I agree with him: I think that a stockholder in a corporation does have an insurable interest. It is not necessary, in order to create an insurable interest, that the fee-simple title be vested in the insured. It is enough that he has a direct pecuniary interest which may be destroyed, and is entitled to protection.

Now, if the corporation owns but a single piece of tangible property, the destruction of that property by fire or other loss, certainly, destroys the value of his stock, or at least diminishes it. He has an interest in the protection of that property. In this case it appeared that the corporation owned a steam-boat; that was substantially all its assets. Now, the destruction of that property certainly diminishes the value of the stock held by this plaintiff. He had an interest in the preservation of that property, and he had an insurable interest. If the property was the entire property of the corporation, the destruction of the property practically wiped out the value of his stock. So that I think it is fair to say that a stockholder in a corporation has an insurable interest in the personal, tangible property of the corporation. The policy was taken by the defendant upon his interest. The destruction of the property destroyed that interest, and he is entitled to recover.

I do not mean to say that questions may not arise in which the value of the property destroyed may not be the measure of his damages. In the case put by the supreme court of Iowa, supposing the entire property was a grain elevator, which, by reason of its proximity to a railroad, had a large value, a value in excess of the cost of the elevator, they intimate that the destruction of that elevator might cause a loss to the stockholder in excess of his proportionate share of the cost of the property itself; so, on the other hand, if it appeared that a corporation was in debt largely in excess of the value of its corporate property, and that there was no personal liability upon the stockholder,—it might be that the destruction of the property would work no loss to him, because the property would not pay the debts, and he, having no personal liability, would lose nothing, whether the property was destroyed or not. So, in another case, supposing the property was fully insured by the corporation, and the loss was paid to the corporation, it might be that he would have no separate interest as a stockholder protected by insurance, but would only have recourse upon the assets of the corporation, represented by the amount paid by the insurance company to the corporation.

But these questions simply affect the measure of damages; and the general proposition which is affirmed by the decision of my predecessor, and by the decision of the supreme court of Iowa, and in which I concur, is that a stockholder has an insurable interest in the personal, tangible property of the corporation. In this case, from the testimony, I instructed the jury that the measure of damages was the proportionate interest of the stockholder in the corporation in the value of the boat. Under the testimony, I see no reason to doubt the propriety of the instruction, and the motion for a new trial will be overruled.