## MANNHEIM INS. CO. v. CHARLES CLARKE & CO.

(Court of Civil Appeals of Texas. Galveston. Feb. 20, 1913. On Motion for Rehearing, April 24, 1913. Dissenting Opinion May 2, 1913.)

1. INSURANCE (§ 668*) — PLACE OF LOSS — QUESTIONS OF LAW.

In an action on a policy of marine insurance, where the undisputed evidence showed that the vessel was lost in a river in which the tide from the Mexican gulf ebbed and flowed, the question whether the vessel was in gulf waters was one of law for the court.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1556, 1732–1770; Dec. Dig. § 668.*]

2. INSURANCE (§ 402*)—MARINE INSURANCE— CONSTRUCTION OF POLICY—"GULF WATERS" —"SEA."

A policy of marine insurance provided, in a typewritten clause, that it should be in force only while the vessel was used in the gulf waters of the United States between Key West and the mouth of the Rio Grande river. Another clause of the policy, which was part of the printed form, declared that it was the intention of the insurer to indemnify the insured for loss or hurt to the vessel for which it might be liable against the adventures and perils of the harbors, bays, sounds, seas, rivers, and other waters as above named. The vessel was lost in a river in which the gulf tide ebbed and flowed. Held, that it was lost in gulf waters within the purview of the policy; the expression "gulf waters," like the word "sea," including not only the high seas, but the bays, inlets, and rivers as high up as the tide ebbs and flows.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1088–1090, 1093, 1103–1105; Dec. Dig. § 402.*

For other definitions, see Words and Phrases, vol. 7, pp. 6359–6360.]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

**3. INSURANCE (§ 334*)—MARINE INSURANCE—CONDITIONS—WATCHMAN.**

A warranty in a policy of marine insurance that a competent watchman should always be on board was sufficiently complied with where a competent member of the crew was always detailed as a watchman; the fact that different members of the crew were required to stand different watches, and that they also performed other duties, not being in violation of the warranty.

[Ed. Note.—For other cases, see Insurance, Cent.Dig. §§ 847–852, 854, 855; Dec.Dig. § 334.*]

**4. INSURANCE (§ 334*)—MARINE INSURANCE—WARRANTIES—WATCHMAN—COMPETENCY.**

A policy of marine insurance, providing that the vessel should always have a competent watchman on board, is not avoided by proof that, on the occasion of the accident, the watchman went to sleep, and through his negligence the vessel was lost; the owner complying with the warranty by providing a watchman who was competent.

[Ed. Note.—For other cases, see Insurance, Cent.Dig. §§ 847–852, 854, 855; Dec.Dig. § 334.*]

**5. INSURANCE (§ 403*)—MARINE INSURANCE—"PERILS OF THE SEA."**

Where a vessel is insured against the adventures and perils of the harbors, bays, sounds, seas, rivers, and Mexican gulf waters, those perils include only the natural accidents peculiar to the elements, and not those which happen only by the intervention of man and may be prevented by human prudence; consequently such a policy will not support recovery where the vessel was lost through the failure of the watchman to close the sea valve, through which water was being taken for the boiler, so that the weight of water either tipped the vessel over, or caused it to tip so far that water ran in over its freeboard and sunk it.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1091; Dec. Dig. § 403.*

For other definitions, see Words and Phrases, vol. 6, pp. 5295–5302.]

*On Motion for Rehearing.*

**6. INSURANCE (§ 601*)—MARINE INSURANCE—RECOVERY OF EXPENDITURES BY INSURER.**

Where a marine insurer, under an agreement that a tug should be raised for the benefit of all concerned, but that any action taken to salve the tug would not affect the terms of the policy, but would merely be considered as done for the benefit of all concerned, expended money in raising the sunken vessel, it is entitled to recover back such expenditures; it appearing that it was not liable under the policy.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1500, 1501; Dec. Dig. § 601.*]

**7. APPEAL AND ERROR (§ 742*)—ASSIGNMENTS OF ERROR—SUFFICIENCY.**

In an action against a marine insurer which, with plaintiff, had expended money in salving a sunken vessel, an assignment of error, complaining of the court's refusal to charge that at the time of the sinking of the tug there was no contract in force between the insurer and plaintiff that covered the raising of the tug, and that verdict should be rendered against plaintiff in favor of defendant for any sum paid in raising the tug, submitted in the brief with the first assignment of error, complaining of the refusal of the court to charge that, as the vessel sank in a river, she was not within the waters to the use of which she was limited by the policy of insurance, the sole proposition being that the insurer was not liable because the tug sank in waters not covered by the policy, coupled with another assignment complaining of the court's refusal to charge that the sink-

ing of the tug was not caused by any of the perils against which she was insured, the proposition under which was that the accident was not caused by the perils of the sea, was not sufficient to present on appeal the question whether the insurer was improperly denied compensation for money expended in salvage.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3000; Dec. Dig. § 742.*]

**8. APPEAL AND ERROR (§ 742*)—ASSIGNMENTS OF ERROR—NECESSITY.**

In an action on a policy of marine insurance, where the insurer desires to complain of the judgment which denied it relief on its cross-action, by which it claimed compensation for money expended in salvage, it must raise the point either by an assignment of error, or by a proposition under an assignment in which the point is sufficiently made.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3000; Dec. Dig. § 742.*]

**9. APPEAL AND ERROR (§ 742*)—ASSIGNMENTS OF ERROR—STATEMENTS.**

Under rules for the Courts of Civil Appeals 29, 30, 31 (142 S. W. xii, xiii), providing that each assignment not copied in the brief and accompanied with its appropriate propositions and statements shall be regarded as abandoned, that each point under each assignment shall be stated as a proposition, and that to each of these propositions there shall be subjoined a brief statement of the proceedings, an assignment or proposition not followed by such a statement will not be regarded.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3000; Dec. Dig. § 742.*]

Pleasants, C. J., dissenting.

Appeal from District Court, Galveston County; Clay S. Brigg, Judge.

Action by Charles Clarke, doing business under the name of Charles Clarke & Co., against the Mannheim Insurance Company. From a judgment for plaintiff, defendant appeals. Reversed and rendered.

W. T. Armstrong and Wm. B. Lockhart, both of Galveston, for appellant. James B. & Charles J. Stubbs, of Galveston, for appellee.

McMEANS, J. Charles Clarke, doing business in the name of Charles Clarke & Co., appellee, brought this suit against the Mannheim Insurance Company, appellant, on a marine insurance policy, to recover damages occasioned by the sinking of the steam tug Seminole while moored to the steamboat Alarm, while alleged to be "in the gulf waters of the United States between Key West, Fla., and the mouth of the Rio Grande del Norte, near the market wharf in the Atchafalaya river, at Morgan City, La." He alleged that the sinking of the tug was partly caused by entrance of water into the port water tank, through a sea valve in or near the bottom of the tug, which was used for filling the water tank when she was in fresh water suitable for the boilers; that she was lying with her port side next to the steamer Alarm; that just before she sank more water had been admitted into the port than into the starboard tank, and the weight thereof, pressing downward upon that side,

listed one or both vessels and forced the Seminole from her contact with the Alarm, allowing her to lurch suddenly to port, and admitting large quantities of water over her low freeboard and rail through the doors of the engine and firerooms, causing her to sink. He furthermore alleged that the sea valve was in good order. He further alleged his ownership of the tug, the execution of the policy, and the terms and conditions of the same upon which he relied. He further alleged the measures that were taken in conjunction or with the concurrence of defendant, after she sank, to raise, repair, and put the tug in order; that reasonable and necessary expenses for work and material were thereby incurred and paid by him, for which he alleged that defendant was liable for ten-thirteenths, and that the amount claimed by him was subject to a pro rata credit of smaller disbursements made by defendant in relation to the damages named, of the amount of which he was not advised, but which he was ready and willing to allow when properly presented. He further alleged that defendant had failed to pay him his pro rata, or any part, of the said expenses, on the ground that the tug was not seaworthy, and denied that the tug was unseaworthy for the reasons claimed by defendant. Defendant answered by general demurrer, special exceptions, general denial, and filed a plea in reconvention, in which it denied that under the exceptions and warranties contained in the policy it was liable for any of the expenses incurred and paid by plaintiff in raising and repairing the tug, and alleged that upon being notified by plaintiff of the sinking of the tug, it sent one T. J. Anderson, a skilled ship and engineer surveyor, to Morgan City, and it was agreed by plaintiff and defendant that they, through their representatives, T. J. Anderson and W. H. Crosby, would undertake the raising of the tug for the benefit of all concerned, and according to the ratio of interest at stake, strictly in accordance with the terms and conditions of the policy, and that any action taken by said representatives in their efforts to salve the tug would in no way be misconstrued or affect the terms of the policy; that pursuant to said agreement, and in accordance with the terms of the policy, providing that the acts of the insured or insurers, or agents, in recovering, saving, and preserving the property insured in case of disaster, should not be considered as affirming or denying any liability under the policy, but that such acts should be considered as done for the benefit of all concerned, and without prejudice to the rights of either party; the said Anderson and Crosby successfully raised said tug, and set the tug afloat, and she was delivered to and accepted by plaintiff at Morgan City for his use; that in the work, and with the knowledge and consent of plaintiff, the defendant necessarily incurred and paid expenses, an itemized list of which is set out in the answer; that on the raising of the tug and since then defendant learned that the tug was not caused to sink by any of the perils insured against by the terms of the policy, but by a cause or causes specially excepted by the terms of the policy from the risks and liabilities undertaken by the defendant therein. Defendant set out in detail the various exceptions and warranties in the policy relied on as defenses, and denied that it was liable for any of the expenses sued for by plaintiff, but that plaintiff was justly indebted to it for the expenses it had paid, for the amount of which it prayed judgment. The case was tried before a jury, and resulted in a verdict and judgment for plaintiff for $3,090.34, with 6 per cent. per annum interest thereon from May 1, 1910, from which judgment the defendant, after its motion for a new trial had been overruled, has appealed.

[1, 2] The policy of insurance sued upon is an ordinary marine insurance policy, and insured the tug Seminole, which was valued at $13,000, in the sum of $10,000, from noon on the 29th day of September, 1909, until noon on the 29th day of September, 1910. Practically all of the policy was upon a printed form, but the following provision was inserted by typewriting: "Limited to the use of the gulf waters of the United States, between Key West, Fla., and the mouth of the Rio Grande de Norte, both inclusive." One of the printed provisions of the policy is as follows: "Any deviation beyond the limits named in this policy shall void this policy, but upon return of said vessel within the limits named herein this policy shall reattach and continue in full force and effect, but never beyond the date hereinafter set for the termination of this policy, and provided only no disaster has occurred during said deviation." Another printed clause of the policy is as follows: "It is the intent of this insurance company by this policy to fully indemnify the insured for this company's proportion of all general average charges, salvage expenses and loss, damage, detriment or hurt to said vessel for which it may be liable under this policy, against the adventures and perils of the harbors, bays, sounds, seas, rivers and other waters as above named, and fires that shall come to the hurt, detriment or damage of said vessel or any part thereof." Among the warranties assumed by the insured, as provided in the policy, was one which warranted that the tug "shall at all times have a competent watchman aboard."

The tug Seminole sank in the Atchafalaya river at Morgan City, La., on the night of January 13, 1913. The river from Morgan City to the open gulf is about 18 miles. There was evidence which justified the jury in finding, and in deference to the verdict we find, that the gulf tide at times ebbed and flowed at Morgan City, and even higher up the river; in other words that the gulf

waters by the action of the tides at times reach to and flow beyond Morgan City.

Appellant Insurance Company requested the court to give to the jury its sixteenth special charge, which peremptorily instructed a verdict for it on the ground that the tug, at the time she sank at Morgan City in the Atchafalaya river, was not within the waters to the use of which she was limited by the terms of the policy. It also requested the giving of its forty-fifth special charge, which instructed the jury to return a verdict for it on the ground that at the time the tug sank there was no contract in force between the parties covering the raising of the tug, because it sank in the river. The refusal of the court to give these two charges is made the basis of appellant's first and second assignments of error. Under these assignments appellant advances the proposition that, the allegations of plaintiff's petition and the undisputed facts showing that the Seminole sank in the Atchafalaya river, which is 18 miles above its mouth, where it empties in the Atchafalaya Bay, the court, taking the words in their popular and received sense, should have held, and so instructed the jury, that the tug sank in *river* waters and not in *gulf* waters—that is, the waters of the gulf—and, since by its express terms the policy limited the Seminole to the use of the gulf waters of the United States between Key West, Fla., and the mouth of the Rio Grande, both inclusive, and provided that any deviation beyond the limits named in the policy should void the policy, which should only reattach upon her returning within the limits named, and then only in case no disaster had occurred in the interim, the court should have further held that she was not covered by the policy where and at the time she sank, and should have given the instructions requested. The pleadings and evidence showing beyond dispute that the tug at the time she sank was in the Atchafalaya river, 18 miles above its mouth; and, it being settled by the testimony and the jury's verdict that the gulf waters reached Morgan City by the action of the tides, the question as to whether the tug was in gulf waters at the time becomes one of law. It may be stated in this connection, however, that it was shown by the undisputed evidence that the Seminole had been running in the Atchafalaya river, up to Morgan City, "off and on," since 1903. This testimony was admitted for the purpose of showing the understanding of the parties at the time the contract of insurance was executed, and for the further purpose of aiding in the interpretation of the contract.

Appellant contends that the words "gulf waters" should be construed according to their plain, ordinary meaning, and that, so construed, gulf waters are waters of the gulfs, and river waters are the waters of rivers, and that river waters become gulf waters when they have flowed down to and into the gulf and, conversely, gulf waters become river waters when, by the action of the tides or winds, they have flowed or have been blown into the rivers, that as long as water is in the river it is river water, and as long as it is in the gulf it is gulf water, and that therefore the provision of policy which limited the tug to gulf waters of the United States means just gulf waters or waters of the gulf and not river waters or waters of rivers. We think that the construction placed by appellant upon the provision in question, when considered in connection with another provision of the policy, which we shall further on refer to, is too narrow and restrictive. If adopted, the policy would be voided whenever the tug, the uses of which were mainly applied in harbors and ports, should leave the gulf and enter a harbor or port; in other words, such a construction would cover losses only while the tug was in what is generally known and designated as the gulf. The following language of the policy itself forbids such a construction: "It is the intent of the insurance company by this policy to fully indemnify the insured for this company's proportion of all general average charges, salvage expenses and loss, damage, detriment or hurt to said vessel for which it may be liable under this policy, against the adventures and perils of the harbors, bays, sounds, seas, rivers and other waters as above named." etc. This language, taken in connection with the clause limiting the tug to gulf waters, and with which it is not inconsistent, leads irresistably to the conclusion that it was the intent of the insurance company to indemnify the insured for loss of or damage to the vessel while in any of the waters named, provided the same were gulf waters. Surely such language is inconsistent with the construction that the vessel was insured only while it was in the open gulf. What then are "gulf waters"? These words have received judicial construction in this state.

In Crary v. Port Arthur Channel & Dock Co., 92 Tex. 275, 47 S. W. 967, our Supreme Court had under construction articles 721 and 722 of the Revised Statutes, the first of which reads as follows: "Article 721. This title shall embrace and include the creation of private corporations for the purpose of constructing, owning and operating deep water channels from the waters of the Gulf of Mexico along and across any of the bays on the coast of this state to the mainland, for the purposes of navigation and transportation, and for the construction, owning and operating docks on the coast of this state for the protection and accommodation of ships, boats, and all kinds of vessels for navigation, and their cargoes."

The Port Arthur Channel & Dock Company, having incorporated under this statute, undertook to cut a channel, not from the gulf, but from a point on Sabine Pass about four miles from its entrance into the Gulf

of Mexico, and thence inland to Port Arthur, and sought to condemn Crary's land for this purpose. In deciding the case upon certified questions from this court, Chief Justice Gaines, who delivered the opinion, says: "But it is also insisted that the channel in question is not authorized by the statute, for the reason that it does not start, 'from the waters of the Gulf of Mexico,' as prescribed in article 721. The contention seems to be that by 'the waters of the gulf' is meant the gulf itself. But we think the language in question is far more comprehensive than it would have been had the statute read 'from the Gulf of Mexico.' We are clearly of the opinion that the terms are sufficiently broad to embrace at least all bays, inlets, and streams upon the gulf coast to the extent to which they are subject to the ebb and flow of the tide. We are also of the opinion that we should take judicial notice that the tide ebbs and flows through Sabine Pass. Peyroux v. Howard, 7 Pet. 324 [8 L. Ed. 700]. From these conclusions it follows, as we think, that a channel which proceeds from Sabine Pass proceeds from 'the waters of the gulf' within the meaning of the provisions under consideration."

The decision from which we have just quoted is not without authority to support it. We refer to Waring v. Clark, 46 U. S. (5 How.) 441, 12 L. Ed. 326, where it is said that the "sea" as defined by the admiralty courts means, not only the "high seas," but the arms of the sea, waters flowing from it into ports and havens, and as high up rivers as the tide ebbs and flows. If such be the sea, certainly gulf waters may be construed to mean the waters as high up rivers as the tide ebbs and flows. Again that waters within the ebb and flow of the tides are considered the sea is decided in the matter of In re Gwin's Will, 1 Tuck. (N. Y.) 44. See, also, Cole v. White, 26 Wend. (N. Y.) 516.

We think the cases cited, and especially the Port Arthur Channel & Dock Company Case, is decisive of the question under consideration. and that the refusal to give the special charges requested was not error.

What we have said in disposing of appellant's first and second assignments disposes of the third, fourth, and fifth assignments adversely to appellant's contention; and the same, with the several propositions thereunder, are severally overruled.

[3] Appellant's eighteenth and nineteenth assignments of error are predicated upon the refusal of the court to give in charge to the jury its eighteenth and forty-first special charges, to the effect that at the time the Seminole sank she did not have a competent watchman on board, and that their verdict must therefore be for the defendant. As before stated, plaintiff by the terms of the policy expressly warranted that the Seminole "shall at all times have a competent watchman on board." Defendant pleaded the warranty and its breach as a defense to plain-

tiff's suit, and it may be conceded that the breach of this warranty would void the policy.

On the day before the Seminole sank she had been lightering lumber from Morgan City out to a schooner anchored about 40 miles in the gulf. The tug, returning to Morgan City, reached there about 10:30 at night. At about 11:30 the sea valve on the bottom of the tug toward her port side had been opened so as to admit fresh water into the tank for use in the boilers, but only to the port tank, as the starboard tank had already some water in it. A few minutes before 12 o'clock the chief engineer called to the foreman then on duty to close the valve, and he thought it had been closed, but when the tug was afterwards raised the valve was found open. The undisputed testimony shows that some member of the crew was always on watch on the tug, or, in other words, that some member of the crew was always kept on board as a watchman. Dave Roberts, a fireman, was on watch up to 12 o'clock that night. About 20 minutes before that hour the other fireman, Taylor, was called to stand watch for the balance of that night, and he went on watch at 12 o'clock, and shortly after this the fireman Roberts and the chief engineer, who had been up until this time, retired and fell asleep. Taylor, prior to the time he was called, had been asleep, having retired before the tug reached Morgan City. He testified that he went on duty at 12 o'clock, relieving the other fireman, Roberts. He says he was told when he went on duty that the tug was taking water in her port tank, and was instructed to have her ready at 3 o'clock to go out. He further said: "As to what I did, I just laid down smoking cigarettes and went to sleep; I dropped off to sleep while I was reading and smoking cigarettes and waiting for the tank to fill up—taking water in that port tank—so I dropped to sleep while she was taking water. I woke up, and she was still taking water, and I dropped to sleep again, and I woke up again and she was going over. I laid down on the engine room floor; I had my head on a steam pipe for a pillow. When I woke up and saw she was going over I just ran out on the starboard side."

It was shown by the testimony that when a vessel is tied up for the night, expecting to leave early in the morning, the fireman serves as watchman and is always on watch in the fireroom and on deck, or supposed to be. There was much evidence to the effect that Taylor was a competent watchman, notwithstanding his negligence on this occasion. When a tug is in commission, as the Seminole was, the crew, or some member of the crew, acts as watchman while lying at the dock. If out of service, and no crew aboard, an extra watchman is employed. D. W. Ryan testified in this connection: "As to what officer or member of a crew serve as watchman when the vessel is tied up for the night, man when the vessel is tied up for the night,

they are a deck hand or fireman. Anybody on board can act as watchman, it is always customary to handle it that way." It may be conceded that the tug was caused to sink in part, at least, by reason of the failure of the fireman, who was on watch, to close the sea valve after the port tank had been sufficiently filled. Appellant contends that, it having been shown by the uncontradicted evidence that the fireman, Taylor, who went on watch at 12 o'clock, went to sleep, and that he and all the officers and other members of the crew were asleep from about 12:20 until about 2:30 o'clock, when she sank, the tug did not therefore have a competent watchman, or, in fact any watchman on board from about 12:20 o'clock to the time she sank as required by the terms of the policy.

[4] As the specific duties of a watchman, otherwise than may be implied from the word itself, are not defined in the policy, nor set out in the pleadings or evidence, any person aboard the tug, whose duty it was to give attention to such matters as affected the tug's safety while moored at a dock at night, is, we think, in all essential respects a watchman. It was proven that Taylor was called to go on watch, and that he did go on watch, and that he was competent and reliable. The policy did not require that the watchman should be one especially employed for that purpose, and the warranty was fully met by having at all times a competent watchman on board, although the person who performed this duty might have other duties to perform in the operation of the tug, and might have been negligent on this occasion, or that this duty may have been imposed on different members of the crew at different times. The requirement was that the tug should at all times have a watchman on board, and that he should be competent. No question is made by appellant as to the competency of others of the tug's crew at the times they may have been on watch, and the jury was authorized by the evidence to find that Taylor was competent.

We cannot distinguish this case, in principle, from that of Phœnix Ins. Co. v. Coffman, 10 Tex. Civ. App. 631, 32 S. W. 810. In that case the application for insurance contained an agreement that a watchman should be on the premises at night, and at all times when work was suspended. The property insured was burned, and it was shown that the watchman was asleep at the time the fire began. It was held that the insured, by employing a reliable watchman and charging him with the duty of watching the premises, substantially complied with the contract in that respect, though the watchman may have been asleep at the time of the fire. A writ of error was refused. To the same effect is Burlington Ins. Co. v. Coffman, 13 Tex. Civ. App. 439, 35 S. W. 406. In that case the warranty in the policy was

as follows: "Warranted on the part of the assured that a watchman shall be kept on duty at night, or this policy shall be void." It was shown that the insured kept a watchman in his employ to watch the premises at night. The fire occurred at night, at which time the watchman was asleep. The court says: "Upon very plain principles, the courts, while requiring a strict compliance with a warranty in insurance contracts, will not exact performance beyond its terms. What was required in this instance was that the insured should keep a watchman on duty upon the premises at night. The agreement was complied with when he employed and kept such a servant upon the premises as a night watchman, provided he exercised reasonable care in the selection and retention of the person for that employment. The provision does not stipulate whereabouts upon the premises the watchman should remain, nor does it stipulate that he should be constantly on the alert (citing Crocker v. Insurance Co., 8 Cush. [Mass.] 79)."

On the authority of the cases cited we hold that the warranty that the tug "shall at all times have a competent watchman on board" was fully complied with when the duty of watchman was assigned to Taylor, who was shown to have been competent, and that the mere fact that Taylor was negligent on this occasion, and did not keep watch as he should have done, was not of itself a breach of the warranty. It was not error, therefore, to refuse to give the charges in question, and the assignments raising the point are overruled.

Appellant presents its twenty-fifth, twenty-sixth, and twenty-seventh assignments of error together. The twenty-fifth complains of the refusal of the court to give its first requested special charge, which is as follows: "You are instructed that the sinking of the tug Seminole was not caused by any of the perils against which she was insured by the terms of the policy in this case, and your verdict will therefore be against the plaintiff and for the defendant." The twenty-sixth complains that the verdict is contrary to the law as given in charge by the court, because the uncontradicted evidence, or at least the great preponderance of the evidence, shows that the sinking of the tug was caused by the intervention of man and could have been prevented by human prudence. The twenty-seventh assignment complains that the uncontradicted evidence, or at least the great preponderance of the evidence, showed that the tug did not sink because of a peril against which she was insured by the terms of the policy.

[5] Appellant contends under these assignments that, the uncontradicted evidence having shown that the sinking of the tug was was not caused by any violent action of wind or waves, or by her coming in contact with a rock or shoal or other external object, but solely and proximately by the leav-

ing of her sea valve open, which permitted water to enter her hold and sink her, and which might have been prevented by proper care, her sinking was not caused by any adventure or peril against which she was insured by the terms of the policy. It may be conceded, and the evidence abundantly justifies the conclusion, that the proximate cause of the sinking of the tug was the entry of water into the vessel through the sea valve. The evidence shows that the Seminole was tied up alongside the steamboat Alarm. They were headed in opposite directions, and their port sides were together. Appellee's theory of the case of the sinking is that, as the freeboard of the tug was higher than that of the steamboat, it overlapped that of the latter, and when the tug was weighted down with the water running into her port side, her freeboard rested on that of the Alarm until the weight became so great that it caused one or both vessels to list, and forced the tug from her contact with the steamboat, allowing her to lurch suddenly to port, and admitting large quantities of water over her low freeboard and rail through the doors of the engine and firerooms. There was some evidence that this was the cause of the tug's sinking, but this theory was strenuously combatted by appellant by testimony to the effect that the sinking could not have been caused in this way, but that it was due solely to the entry of water through the sea valve. As we view the law, it is immaterial as to which of these theories is correct. The tug was insured against the "adventures and perils of the harbors, bays, sounds, seas and rivers and other waters as above named." The court charged the jury that "the perils described and referred to by this policy of insurance denote the natural accidents peculiar to those elements which do not happen by the intervention of man, nor are to be prevented by human prudence." If this, be the law, and if the sinking of the tug was due to the entry of water through its sea valve as a proximate cause, although not as the sole proximate cause, then the verdict of the jury is indeed contrary to the law and to the court's charge, and the judgment must be reversed. The inquiry then is, What are the adventures and perils of the harbors, bays, sounds, seas, and rivers, as those terms are used in the policy?

The phrase "perils of the sea" has many times been judicially defined. Mr. Parsons in his work on Marine Insurance (volume 1, p. 544) says: "The phrase 'perils of the sea' covers all losses or damages which arise from the extraordinary action of the wind or sea, or from inevitable accident directly connected with navigation, except those provided for in other parts of the policy, as captures and the like." In 3 Kent's Commentaries it is said that the phrase "perils of the sea" denotes "natural accidents, peculiar to that element, which do not happen by the intervention of man, nor are to be prevented by human prudence." The phrase is defined in 19 Am. & Eng. Enc. of Law, 1023, as follows: "The term 'perils of the sea' denotes all marine casualties resulting from the violent action of the elements, as distinguished from their natural silent influences upon the subject insured—casualties which may, and not consequences which must, occur. In considering what is and what is not a peril of the sea the question is whether the loss arose from injury from without or weakness from within. To make the insurer liable the injury must have been occasioned by a storm or accident that would injure a seaworthy vessel." In Anthony v. Ætna Ins. Co., 1 Fed. Cas. 1046, the policy sued on covered perils of the lakes, seas, rivers, canals, etc. In construing the term "perils of the sea" it was said that the general doctrine is that the insurer undertakes in marine risks only to indemnify against extraordinary perils of the sea, and not against those ordinary ones to which every ship must be inevitably exposed. "Every loss which arises from tempests, or by rocks, winds, or waves strictly and naturally comes under the idea of a loss occasioned by perils of the sea." The opinion quotes with approval the remarks of Justice Storey in the case of The Reeside, 20 Fed. Cas. 458, that the " 'danger of the seas,' whether understood in its most limited sense, as importing only a loss by natural accidents peculiar to the element, or whether understood in its more extended sense, as including inevitable accidents, upon that element, must still in either case be clearly understood to include only such losses as are of an extraordinary nature, or arise from some irresistible force or some overwhelming power, which cannot be guarded against by the ordinary exertions of human skill and prudence." Phillips, Insurance, § 35, lays down the rule as follows: "Perils of the seas, which constitute a part of the risks in almost every marine policy, comprehend those of the winds, waves, lightning, rocks, shoals, collisions, and, in general, all causes of losses or damage to the property insured arising from the elements and inevitable accidents." In 26 Cyc. 652, "perils of the sea" are said to "embrace all kinds of marine casualties, such as shipwreck, foundering, stranding, collision and every species of damage done to the ship or goods at sea by the violent action of the winds or waves. They do not embrace all losses happening on the seas." The same work, on page 653, says that where the policy is to cover risks on inland waters the phrase, "perils of the rivers, lakes, and canals," is generally substituted for "perils of the seas"; the words include the same character of losses as are included within perils of the sea, and in addition thereto those perils which are peculiar to

inland waters, such as ice and swells. In 2 Arnold on Marine Insurance, 744, it is said that the term "perils of the seas" embraces "all kinds of marine casualties, such as shipwreck, foundering, stranding, etc., and every species of damage to the ship or goods at sea, by the violent and immediate action of the wind and waves," not comprehended "in the ordinary wear and tear of the voyage, or directly referable to the acts and negligence of the assured as its proximate cause."

Authorities on this point might be multiplied, but we think that these quoted are sufficient for the conclusion that the sinking of the tug Seminole, proximately caused by the negligence of some member or members of its crew in failing to close the sea valve, was not a loss due to the "adventures and perils of the harbors, bays, sounds, seas, rivers," etc., and therefore the loss was not covered by the policy sued on. Even if appellee's theory that the weight of the water pressing downward upon the tug's port side listed one or both vessels, and forced the tug from her contact with the Alarm, thus allowing her to lurch suddenly, and in this way admitted water over her freeboard and into her fire and engine rooms, and caused her to sink, be correct, these facts, we think, do not make a case of loss from the perils insured against by the terms of the policy, or bring this case within the class of cases where recoveries have been allowed on policies insuring against the adventures and perils of the seas, etc., especially when considered with the further fact that the vessels would not have listed and the lurch have occurred but for the entry of water through the sea valve, which was negligently left open and the negligent failure to close which was the proximate cause of the sinking.

We think, therefore, that the judgment against appellant was erroneous, and that it should be reversed and judgment here rendered for appellant, and it has been so ordered.

This conclusion obviates the necessity of a discussion at length of the many other assignments of error urged by appellant. It is sufficient to say that we have examined the other assignments, and are of the opinion that they do not point out error.

The judgment of the court below is reversed, and judgment is here rendered for appellant.

Reversed and rendered.

### On Motion for Rehearing.

We have carefully examined appellee's motion for a rehearing, and a majority of the members of this court think that it should be overruled, and it has been so ordered. Chief Justice PLEASANTS dissents from the decision of the majority and will at an early date present his views in writing.

[6, 7] Appellant requests us to reform the judgment rendered by this court in its favor by further rendering judgment for it for the amount of the expenses incurred by it in raising the tug. In our statement of the issues made by the pleadings it will be seen that appellant alleged that it had an agreement with Charles Clarke & Co. whereby it was understood and agreed that they would jointly act in the effort to raise the tug, for the benefit of all concerned and strictly in accordance with the terms of the policy, and that any action taken by it to salve the tug would in no way be construed as affirming or denying liability under the policy, or as affecting the terms of the policy. It was alleged, in effect, that in said work appellant incurred and paid certain expenses, an itemized statement of which was attached to the answer as an exhibit, and that, as the sinking of the tug was not caused by a peril insured against, appellant was entitled to be reimbursed by appellee for the expenses so paid, and that when this court reversed the judgment of the court below in favor of Charles Clarke & Co. and rendered judgment that appellee take nothing, this court should have, at the same time, rendered judgment in its favor for the expenses so paid by it in salving the tug. We recognize the reasonableness of this request; and, if the matter had been presented to us in such a way as to authorize it, this court would have rendered such a judgment in appellant's favor when it decided the case.

The verdict of the jury is as follows: "We, the jury, find for the plaintiff in the sum of $3,090.34, with interest thereon at the rate of 6 per cent. per annum from May 1, 1910, and we find against the defendant." The judgment was entered in conformity to the verdict. We take the following from the concluding portion of the decree: "And it is further ordered, adjudged, and decreed by the court that the said defendant, the Mannheim Insurance Company, of Mannheim, Germany, a foreign corporation, take nothing by reason of its cross-action or counterclaim against the plaintiff, Charles Clarke, doing business under the name of Charles Clarke & Co., and that he go hence without day." In none of appellant's assignments of error is this part of the judgment attacked, and nowhere in appellant's brief is any relief asked as against it.

In its forty-fifth requested charge, the refusal to give which is made the basis of appellant's second assignment of error, the appellant requested the court to charge the jury as follows: " * * * At the time of the sinking of the tug there was no contract in force between the plaintiff and defendant that covered the raising of the tug, provided she sank at Morgan City in the Atchafalaya river. I instruct you to find a verdict against the plaintiff for any amount sued for by him, and I further instruct you to find a verdict against the plaintiff in favor of de-

fendant for any sum or sums you find were incurred and paid by defendant, and that were necessary and reasonable in connection with the raising and salving of the tug." This assignment is submitted in appellant's brief in connection with its first assignment of error, which complains of the refusal of the court to give to the jury its sixteenth special charge, to the effect that when the tug sank in the river, she was not within the waters to the use of which she was limited by the policy of insurance, and that therefore their verdict must be for the defendant. The substance of the proposition following these assignments is set out in the main opinion, and it will be seen that the entire contention is there made that appellant was not liable to appellee for the sole reason that the tug at the time she sank was not in the waters to the use of which she was limited by the terms of the policy. The statement following the proposition relates entirely to the issue raised by the proposition, and nowhere in appellant's brief is there any statement or reference to the evidence showing that appellant had incurred any expenses in salving the tug; and, in so far as this court knows from the brief of appellant, no such expenses were incurred by it. The only other assignment of error presented by appellant in its brief from which it may be contended that the issue was even remotely raised is the twenty-fifth, which complains of the refusal of the court to give its first special charge, which is as follows: "You are instructed that the sinking of the tug Seminole was not caused by any of the perils against which she was insured by the terms of the policy in this case, and your verdict will therefore be against the plaintiff and for the defendant." This assignment was submitted in connection with the twenty-sixth and twenty-seventh. The substance of the proposition following these assignments is given in our main opinion, from which it will be seen that the only ground for reversal urged under the assignments was that the sinking of the tug was not caused by any adventure or peril against which she was insured by the terms of the policy; and the statement following relates only to the cause of the sinking, and does not remotely refer to the expenses incurred by appellant in the raising of the tug.

[8, 9] If appellant desired to challenge on appeal the verdict and judgment rendered against it on its cross-action in the court below, it should have done so by either an assignment of error expressly raising the point, or by a proposition under an assignment in which the point is sufficiently made. In either event there should have been subjoined a brief statement, in substance, of so much of the evidence contained in the record as would be sufficient to support and explain the proposition, with reference to the pages of the record. An assignment or proposition not followed by such a statement will not be, and in justice to opposing parties ought not to be, regarded. Rules 29, 30, and 31 (142 S. W. xii, xiii); Railway v. Wells, 146 S. W. 645; Lam v. Railway, 142 S. W. 979; Gamer v. Gamage, 147 S. W. 722.

We are of the opinion that appellant's motion for a rehearing and to reform the judgment rendered by this court should be denied, and it has been so ordered.

PLEASANTS, C. J. (dissenting). I cannot agree with my Associates in the conclusion that the loss sustained by the appellee, for recovery of which this suit was brought, was not covered by the insurance policy sued on and therefore appellee is not entitled to recover such loss.

The question is whether the sinking of appellee's boat in the circumstances alleged in the petition and shown by the evidence was a "peril of the sea," as that term was used and understood by the parties in the policy of insurance.

The opinion of the majority quotes a number of definitions of the term "perils of the sea," and assuming that these definitions are full, accurate, and exclusive, holds that the sinking of the appellee's boat was not due to a peril of the sea because it was proximately caused by the negligence of the watchman in leaving its sea valve open.

The evidence is sufficient to sustain the finding of the jury that the sudden lurching of the boat, by which the water was caused to rush over its side and into the engine and firerooms in such quantities as to cause it to sink, was due to its sudden slipping from its contact with the Alarm, the boat by which it was moored, as alleged in the petition. The opinion of the majority does not question the sufficiency of the evidence to sustain this finding further than is involved in the holding that the negligence of the watchman in leaving open the sea valve was the proximate cause of the accident. I do not think the question of whether the negligence of the watchman was a proximate cause or the proximate cause of the sinking of the boat is material in determining whether or not such sinking was a peril of the sea. No rule is better settled by the decisions of the highest courts of England and America than that the insurer is not released from liability for loss due to a peril of the sea by reason of the fact that such peril was occasioned or proximately caused by the negligence of the master or crew unless the policy of insurance expressly excepts a loss so caused.

In Phœnix Ins. Co. v. E. & W. T. Trans. Co., 117 U. S. 312, 6 Sup. Ct. 1176, 29 L. Ed. 873, the Supreme Court of the United States say: "It is conclusively settled, in this country and in England, that a policy of insurance, taken out by the owner of a ship or goods, covers a loss by perils of the sea or other perils insured against, although occasioned by the negligence of the master or crew."

The former rule, and the reasons which induced the courts to adopt the one now uniformly followed, is thus stated by the Supreme Court of Massachusetts in the case of William Nelson et al. v. Suffolk Ins. Co., 8 Cush. (Mass.) 477, 54 Am. Dec. 776: "It seems to have been formerly held, that underwriters were not responsible for losses which happened in consequence of the negligence of the master or crew in the navigation of the ship. This doctrine would go far to deprive the insured of the benefit and protection of this policy, without any fault of his own, and would greatly lessen, if it did not destroy, the usefulness of insurance. Some fault or negligence on the part of the master or mariners enters into almost every case of a loss or damage of a vessel at sea. The danger from such fault or negligence is one of the dangers which the insured has most reason to apprehend, and against which he most needs and may reasonably expect protection. * * * The great principle, now well established, is that if the vessel, the master, officers, crew, and equipments are competent and sufficient at the commencement of the voyage, the assured has done all that he contracted to do; he did not guaranty the faithfulness and vigilance of the master and crew, and he is not responsible for their negligence, but for the conduct of the master and mariners, in the practical navigation and management of the vessel, after the commencement of the voyage, the insurers are responsible, provided the actual loss arise from one of the perils insured against, though such peril may have occurred in consequence of the negligence or carelessness of the master and crew."

Any number of decisions could be cited in support of this rule.

While I have found no case in which the accidental sinking of a boat in circumstances exactly similar to those which attended the sinking of the Seminole was held to be a peril of the sea, it is well settled that it is not necessary that the extraordinary action of the water which caused the loss should be due to natural causes in order to make such loss a peril of the sea.

In Crescent Ins. Co. v. Vicksburg, etc., Packet Co., 69 Miss. 208, 13 South. 254, 30 Am. St. Rep. 537, Chief Justice Campbell for the court says: "The injury to the cotton by water of the river, into which it was thrown by a mishap to the boat, was a peril of the river within the terms of the policy; and, if it be true that the careening of the boat resulted from negligence in unloading, the insurer is liable. Redman v. Wilson, 14 Mees. & W. 476. The immediate cause of injury to the cotton was water of the river. That it got into the river because of some carelessness or unskillfulness of those engaged in unloading does not relieve the insurer from liability. To relieve from liability because of acts of the master or crew, there must be want of good faith and honesty of purpose. 1 Phil. Ins. § 1049; May, Ins. § 408; Fland. Ins. 477; 14 Am. & Eng. Ency. of Law, p. 383, note 2; and numerous cases. On this subject there is no difference between marine and other insurance. Whatever diversity of view on this question once existed, it is now firmly settled in England and America, as stated above. 'Where a peril of the sea is the proximate cause of a loss, the negligence which caused that peril is not inquired into.' Insurance Co. v. Sherwood, 14 How. 361 [14 L. Ed. 452]." In above case the careening of the boat, which threw the cotton into the river, resulted from negligence in unloading.

In Davidson v. Burnand (an English case) L. R. 4, C. P. 117 cited in Phœnix Ins. Co. v. E. & W. Trans. Co., 117 U. S. 312, 6 Sup. Ct. 1176, 29 L. Ed. 879; 1 Sans. Dig. Ins. 1023, 26 Cyc. 652, the facts were that while the ship was loading, the increased weight of cargo carried the discharge pipe below the surface of the water, which passed down the pipe under the valve through the cocks, negligently left open, and flowed into the hold, injuring the plaintiff's goods. This was held a loss by a peril of the sea.

In Pa. Ry. v. Manheim Ins. Co. (C. C.) 56 Fed. 301, the loss was caused by the careening of the lighter on which the goods were placed after delivery by a railroad company to be loaded on a ship, such careening being caused by the settling of the lighter upon a dangerous log. Held, that the loss was a sea peril and was covered by the policy, and it was immaterial between the parties whether the original grounding and settling on the log was or was not by reason of some one's negligence.

The entrance of sea water into water-tight compartments through an open deadlight, or through leaks caused by rats, has been held to be perils of the sea. 26 Cyc. 1024; Starbuck v. Phœnix Ins. Co., 19 App. Div. 139, 45 N. Y. Supp. 995.

Seaman v. Ins. Co. (C. C.) 21 Fed. 778, was a case in which the insured vessel, while making the trip specified in the policy, accidentally struck the river bank in attempting to make a landing, and was so injured that she sank and became a total loss. Mr. Justice Brewer held that the injury "must be one of the perils of navigation."

In 3 Cooley's Ins. 2883, are cited many cases where a grounding of a vessel in a harbor was deemed a peril of the sea, also injury occasioned by a leakage, the leak being caused by rats.

In Hutchins v. Ford, 82 Me. 370, 19 Atl. 834, it is said: "The law is now well settled that disaster, caused by a peril insured against, resulting from stranding or collision, resulting from negligence of the master or mariners, is covered by a policy of marine insurance." Many cases are there cited.

1 Abbott's Merchants Ships (an English work) 615, 616, reviews the English cases holding that a peril of the sea is not con-

fined to cases of extraordinary violence of winds or waves. He quotes Lord Herschell: "Now I quite agree that in the case of a marine policy the causa proxima alone is considered. If that which immediately caused the loss was a peril of the sea, it matters not how it was induced, even if it were by the negligence of those navigating the vessel. It is equally clear that in the case of a bill of lading you may sometimes look behind the immediate cause, and the shipowner is not protected by the exception of perils of the sea in every case in which he would be entitled to recover on his policy, on the ground that there has been a loss by such perils." On the same page Lord Herschell quotes from Justice Willes: "It is only necessary to see whether the loss comes within the terms of the contract, and is caused by perils of the sea; the fact that the loss is partly caused by things not distinctly perils of the sea does not prevent it coming within the contract. In the case of a bill of lading it is different, because there the contract is to carry with reasonable care, unless prevented by the excepted perils."

In 1 Abbott's Merchants Ships, 617, the case of Hamilton v. Pandorf, 12 App. Cas. 518, decided by the House of Lords, is referred to. It was an action for damage to cargo by sea water, which had been let into a ship by rats gnawing a hole through a lead pipe. The bill of lading excepted dangers and accidents of the sea. Lord Halsbury, L. C. said: "One of the dangers which both parties to the contract would have in their minds would, I think, be the possibility of the water getting into the vessel from the sea upon which the vessel was to sail in accomplishing her voyage. It would not necessarily be by a storm—the parties have not so limited the language of the contract—it might be by striking on a rock, or by excessive heat, so as to open some of the upper timbers; these, and many more, contingencies that might be suggested would let the sea in, but what the parties, I think, contemplated was that any accident (not wear and tear, or natural decay) should do damage by letting the sea into the vessel, that that should be one of the things contemplated by the contract."

In Potter v. Ins. Co., 19 Fed. Cas. 1186, 2 Summ. 197 (No. 11,339) Justice Story held that a ship, which was sound and lying at a wharf, grounded and began to leak, as the surveyors reported, by lying badly on the ground. This was held within the perils of the sea, for which the underwriters were liable. 19 A. & Eng. 1937, 1939.

I do not think these cases can be distinguished on principle from the instant case.

If we get from the shadow of a precedent, which consists only in the formal repetition of a technical definition of the term "perils of the sea," that in the very cases in which the courts have seemingly recognized its ac-

curacy has been "more honored in its breach than in its observance," and view the question in the light of reason, fairness, and justice, I think the injury to the Seminole should be held to have been caused by a peril of the sea. It cannot be denied that the sinking of a boat by the accidental inrush or overflow of the waters or waves of the sea is a peril of the sea if those words are given their natural and ordinary meaning. It is certainly a danger peculiar to the sea, a casualty that could not happen on land, and a danger or peril ever present in the navigation of water.

When the plaintiff in this case obtained and paid for a policy insuring it against loss by "perils of the sea," it is reasonable to assume that it understood such terms in their broadest sense as covering any loss peculiarly incident to the navigation of water, whether proximately caused by the negligence of the crew or not, and it is fair to presume that the defendant intended that the plaintiff should so understand and interpret the policy. If this is true, upon what principle of reason or justice can defendant be relieved of its obligation of indemnity on the ground that the loss was proximately caused by the negligence of the watchman in leaving open the sea valve?

My conclusion is that the motion for rehearing should be granted, and the judgment of the court below affirmed.